# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION )
FOUNDATION, *et al.,* )
               Plaintiffs, )
v. )           Civil Action No. 09-CV-439
STEPHEN AYERS, )
ACTING ARCHITECT OF )
THE CAPITOL )
               Defendant. )
               )

**Brief *Amicus Curiae* of the American Center for Law and Justice, United States Representative Randy Forbes, United States Senators Jim DeMint, James Inhofe, and Roger Wicker, and United States Representatives Robert Aderholt, Todd Akin, Rodney Alexander, Michele Bachmann, Roscoe Bartlett, Rob Bishop, Marsha Blackburn, Roy Blunt, John Boehner, John Boozman, Dan Burton, Eric Cantor, Mike Conaway, Virginia Foxx, Scott Garrett, Bob Goodlatte, Ralph Hall, Gregg Harper, Jeb Hensarling, Bob Inglis, Sam Johnson, Walter Jones, Jim Jordan, Steve King, John Kline, Doug Lamborn, Don Manzullo, Kevin McCarthy, Thaddeus McCotter, Patrick McHenry, Cathy McMorris Rodgers, Candice Miller, Jeff Miller, Jerry Moran, Randy Neugebauer, Mike Pence, Joseph Pitts, Ted Poe, John Shadegg, John Shimkus, Bill Shuster, Mark Souder, Todd Tiahrt, Zack Wamp, Joe Wilson, and Don Young in Support of Defendant's Motion to Dismiss**

---

Geoffrey R. Surtees
    *Counsel of Record*
AMERICAN CENTER FOR LAW &
    JUSTICE
6375 New Hope Rd.
New Hope, KY 40052
Phone: (502) 549-7020
Fax: (502) 549-7110

Jay Alan Sekulow*
Stuart J. Roth*
Shannon B. Demos*
AMERICAN CENTER FOR LAW &
    JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
(202) 546-8890
* - Not admitted in this court

*Counsel for Amici*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICI* ........................................................................1

SUMMARY OF ARGUMENT ..............................................................4

ARGUMENT ........................................................................................6

I.      BOTH THE NATIONAL MOTTO "IN GOD WE TRUST" AND THE
        PLEDGE OF ALLEGIANCE ACCURATELY REFLECT THE
        HISTORICAL FACT THAT THIS NATION WAS FOUNDED UPON A
        BELIEF IN GOD ........................................................................6

II.     THE FIRST AMENDMENT DOES NOT COMPEL THE REDACTION
        OF ALL REFERENCES TO GOD JUST TO SUIT ATHEISTIC
        PREFERENCES ........................................................................11

III.    THE CONSTITUTIONALITY OF THE NATIONAL MOTTO "IN GOD
        WE TRUST" AND THE REFERENCE TO GOD IN THE PLEDGE OF
        ALLEGIANCE IS WELL ESTABLISHED IN CASE LAW ....................18

        A.      The Supreme Court in Dicta Has Specifically Noted the
                Constitutionality of the National Motto ..............................18

        B.      Lower Courts Uniformly Have Upheld the Constitutionality of the
                National Motto and the Pledge of Allegiance .....................25

Conclusion ......................................................................................31

Certificate of Service ......................................................................33

# TABLE OF AUTHORITIES

*Cases*

*Abington v. Schempp*, 374 U.S. 203 (1963)............................................. 12-14, 23, 28

*ACLU v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289 (6th Cir. 2001) ...27

*ACLU of Kentucky v. Mercer County*, 432 F.3d 624 (6th Cir. 2005)...............15, 16

*ACLU v. McCreary County*, 96 F. Supp. 2d 679 (E.D. Ky. 2000).........................27

*Aronow v. United States,* 432 F.2d 242 (9th Cir. 1970) ................................ 4, 25-27

*Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987) .............................1

*Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) ...........................................................1

*Church of the Holy Trinity v. United States*, 143 U.S. 457, 470 (1892).................11

*Circle Sch. v. Pappert,* 381 F.2d 172 (3d Cir. 2004) ...............................................31

*County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573 (1989)...... 7, 23-25

*Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 198 (5th Cir. 2006) ..............30

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) ..................... 19-22, 31

*Engel v. Vitale*, 370 U.S. 421 (1962) ...............................................................13, 14

*Freedom from Religion Found. v. Hanover Sch. Dist.*, No. 07-cv-356-SM, 2009
U.S. Dist. LEXIS 90555 (D.N.H. Sept. 30, 2009) ...................................................30

*Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996) ......................................26, 27

*Lambeth v. Bd. of Comm'rs*, 321 F. Supp. 2d 688 (M.D.N.C. 2004) .....................28

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993).........1

*Lee v. Weisman,* 505 U.S. 577 (1992) ......................................................................14

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ......................................................12, 22, 23

*McConnell v. FEC*, 540 U.S. 93 (2003).......................................................................1

*Meyers v. Loudon County Public Schools,* 418 F.3d 395 (4th Cir. 2005)...............29

*Meyers v. Loudoun County Sch. Bd.*, 251 F. Supp. 2d 1262 (E.D. Va. 2003) ........28

*Newdow v. Elk Grove Unified Sch. Dist.*, 328 F.3d 466 (9th Cir. 2002)................31

*Newdow v. United States Congress*, 328 F.3d 466 (9th Cir. 2003) ........................17

*O'Hair v. Murray*, 462 F. Supp. 19 (W.D. Tex. 1978) ....................................27, 28

*Opinion of the Justices, Supreme Court of New Hampshire*, 228 A.2d 161 (N.H. 1967) ................................................................................................................28

*Pleasant Grove City v. Summum*, 172 L. Ed. 2d 853 (Feb. 25, 2009)......................1

*Schmidt v. Cline*, 127 F. Supp. 2d 1169 (D. Kan. 2000) ........................................28

*Sherman v. Community Consolidated School District 21*, 980 F.2d 437 (7th Cir. 1992) ................................................................................................5, 25, 28, 29, 31

*W. Va. State Bd. of Educ. v. Burnette*, 319 U.S. 624 (1943) ..................................31

*Zorach v. Clauson*, 343 U.S. 306 (1952) ..........................................................12, 17

**Other Authorities**

2 U.S.C. § 61d...........................................................................................................9

31 U.S.C. § 5112(d)(1) (1982 ed.)...........................................................................10

36 U.S.C. § 119..........................................................................................................9

36 U.S.C. § 302........................................................................................................10

*The Declaration of Independence* (U.S. 1776)............................................... *passim*

Douglas W. Kmiec, *Symposium on Religion in the Public Square: Forward: Oh God! Can I Say that in Public?*, 17 NOTRE DAME J.L. ETHICS & PUB. POL'Y 307, 312-13 (2003) ................................................................................................11

House Report No. 84-1959, 1956 Cong. & Admin. News, p. 3720 .................11, 26

*Inaugural Addresses of the Presidents of the United States*, S. Doc. No. 10, 101st Cong., 1st Sess. (1989) ...............................................................................................8

1 J. Richardson, *A Compilation of Messages and Papers of the Presidents, 1789-1897*, p. 64 (1899) ...............................................................................................8

Jared Sparks, *The Writings of George Washington*, Vol. XII, p. T19 (1833-1837)..8

L. Aikman, *We the People: The Story of the United States Capitol* 122 (1978).......9

Mayflower Compact, *available at* http://www.project21.org/MayflowerCompact.html ................................................17

Philip Hamburger, *Separation of Church and State* 480 (2002) ..............................7

President Abraham Lincoln, *The Gettysburg Address* (Nov. 19, 1863)........6, 17, 18

Presidential Proclamation No. 2629, 58 Stat. 1160 ...................................................8

Research Report, The Pluralism Project, Harvard University, *available at* http://pluralism.org/research/profiles/display.php?profile=74229 ..........................10

Steven Epstein, *Rethinking the Constitutionality of Ceremonial Deism,* 96 COLUM. L. REV. 2083, 2122 (1996).......................................................................................10

Thomas Jefferson, *Notes on Virginia* Q.XVIII (1782) .............................................7

Thomas Jefferson, *Rights of British America*, 1774. ME 1:211, Papers 1:135 .........7

# INTEREST OF *AMICI*[*]

*Amicus,* the American Center for Law and Justice (ACLJ), is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have argued in numerous cases involving First Amendment issues before the Supreme Court of the United States and other federal and state courts. *See, e.g., Pleasant Grove City v. Summum*, 172 L. Ed. 2d 853 (Feb. 25, 2009); *McConnell v. FEC*, 540 U.S. 93 (2003); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990); *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569 (1987).

*Amici* United States Representative Randy Forbes, United States Senators Jim DeMint, James Inhofe, and Roger Wicker, and United States Representatives Robert Aderholt, Todd Akin, Rodney Alexander, Michele Bachmann, Roscoe Bartlett, Rob Bishop, Marsha Blackburn, Roy Blunt, John Boehner, John Boozman, Dan Burton, Eric Cantor, Mike Conaway, Virginia Foxx, Scott Garrett, Bob Goodlatte, Ralph Hall, Gregg Harper, Jeb Hensarling, Bob Inglis, Sam Johnson, Walter Jones, Jim Jordan, Steve King, John Kline, Doug Lamborn, Don Manzullo, Kevin McCarthy, Thaddeus McCotter, Patrick McHenry, Cathy

---

[*] This brief is filed upon Motion to the Court and with the consent of the parties. Amicus ACLJ discloses that no counsel for any party in this case authored in whole or in part this brief and that no monetary contribution to the preparation of this brief was received from any person or entity other than *amici curiae*.

McMorris Rodgers, Candice Miller, Jeff Miller, Jerry Moran, Randy Neugebauer, Mike Pence, Joseph Pitts, Ted Poe, John Shadegg, John Shimkus, Bill Shuster, Mark Souder, Todd Tiahrt, Zack Wamp, Joe Wilson, and Don Young are currently serving in the One Hundred Eleventh Congress.

*Amici* have dedicated time and effort to defending and protecting Americans' First Amendment freedoms. It is this commitment to the integrity of the United States Constitution and Bill of Rights that compels them to support dismissal of the Plaintiffs' Complaint. Plaintiffs', and specifically the Freedom From Religion Foundation's, strategy to purge all religious observances and references from American public life must not be permitted to move forward.

Plaintiffs' crusade, targeting religious expression in the federal government, serves no purpose other than to waste judicial resources at a time in our Nation's history when those resources are needed in cases involving real threats to American liberties. Moreover, if Plaintiffs are successful, it will undoubtedly embolden further challenges to other religious expressions in government venues, including the several religious works of art[1] and various religious inscriptions in

---

[1] For example, in the Rotunda of the Capitol Building are paintings with religious themes, such as *The Apotheoisis of Washington*, depicting the ascent of George Washington into Heaven, and the *Baptism of Pocahontas,* portraying Pocohontas being baptized by an Anglican minister.

the Capitol Complex,[2] as well as the prayer rooms in House and Senate Office buildings.[3]

Amici take the position that the national motto "In God We Trust" and the Pledge of Allegiance in no way violate the Establishment Clause of the First Amendment to the United States Constitution. These expressions simply echo the sentiments found in the Declaration of Independence and recognize the undeniable truth that our freedoms come from a source higher than the state. These sentiments were adopted for the express purpose of reaffirming America's unique understanding of this truth. While the First Amendment affords atheists complete freedom to disbelieve, it does not compel the federal judiciary to redact religious references in every area of public life in order to suit atheistic sensibilities.

Amici urge this Court to uphold the use of "In God We Trust" and the Pledge of Allegiance by granting the Defendant's motion to dismiss Plaintiffs' claims.

---

[2] For example, a wall in the Cox Corridor of the Capitol is inscribed with a line from Katherine Lee Bates' Hymn, America the Beautiful, "America! God shed his grace on Thee, and crown thy good with brotherhood from sea to shining sea." In the prayer room of the House Chamber, two distinctly religious statements are inscribed: 1) "Annuit coeptus," which means God has favored our undertakings; and 2) "Preserve me, O God, for in thee do I put my trust,"  Psalm 16:1.

[3] Plaintiffs' overall strategy seeks to proscribe religious expression well beyond the display of the national motto and the Pledge of Allegiance including presidential addresses invoking the name of God, the use of legislative chaplains, the invocation "God save the United States and this Honorable Court" prior to judicial proceedings, oaths of public officers, court witnesses, and jurors and the use of the Bible to administer such oaths, the use of "in the year of our Lord" to date public documents, the Thanksgiving and Christmas holidays, the National Day of Prayer, and the phrase "under God" in the Pledge of Allegiance.

## SUMMARY OF ARGUMENT

The government's use and display of this country's national motto, "In God We Trust," ("the Motto"), and the Pledge of Allegiance ("the Pledge"), are fully consistent with the Establishment Clause of the First Amendment to the United States Constitution. The words of both the motto and the Pledge echo the conviction held by this Nation's Founders that our freedoms come from God. Congress codified "In God We Trust" as our national motto for the express purpose of reaffirming America's unique history and understanding of this truth, and to distinguish America from atheistic nations who recognize no higher authority than the State.

Practically every court that has decided the issue has held that the national motto and the Pledge of Allegiance present no Establishment Clause concerns. For example, in *Aronow v. United States,* 432 F.2d 242 (9th Cir. 1970), the Ninth Circuit Court of Appeals dismissed an identical challenge to federal statutes requiring the national motto to be inscribed on U.S. currency:

> It is quite obvious that the national motto and the slogan on coinage and currency "In God We Trust" has nothing whatsoever to do with the establishment of religion. Its use is of a patriotic or ceremonial character and bears no true resemblance to a governmental sponsorship of a religious exercise. . . . While "ceremonial" and "patriotic" may not be particularly apt words to describe the category of the national motto, it is excluded from First Amendment significance because the motto has no theological or ritualistic impact.

*Id.* at 243.

In *Sherman v. Community Consolidated School District 21*, 980 F.2d 437, 445 (7th Cir. 1992), the Seventh Circuit further stated, "Unless we are to treat the founders of the United States as unable to understand their handiwork (or, worse, hypocrites about it), we must ask whether those present at the creation deemed ceremonial invocations of God as 'establishment.' They did not."

Although the Supreme Court has never decided a case directly involving the constitutionality of the Motto or the Pledge, its Establishment Clause jurisprudence strongly indicates that the display of either raises no Establishment Clause issues. The Supreme Court repeatedly has explained that government use of religious references is consistent with the Establishment Clause. Moreover, numerous pronouncements by past and present members of the Supreme Court expressly state that the Motto "In God We Trust" and the Pledge of Allegiance pose no Establishment Clause problems.

This Court should grant Defendant's motion to dismiss. A decision holding a display of the Motto or the Pledge unconstitutional would have far-reaching ramifications affecting countless other historical religious references that exist in the public arena. In addition, it would render constitutionally suspect a number of public school practices that traditionally have been considered an important part of American public education. For example, there is no principled means of distinguishing between the use of "In God We Trust" as the national motto and

recitation of the Pledge of Allegiance or any other passages from historical documents reflecting the same truth. The Declaration of Independence and the Gettysburg Address contain the same recognition that the nation was founded upon a belief in God. Holding the Motto or the Pledge unconstitutional would cast substantial doubt upon whether a public school teacher could require students to memorize portions of either the Declaration or the Gettysburg Address. Such a decision would also likely foreclose the nation's school districts from teaching students to sing and appreciate the nation's patriotic music as well as a vast universe of classical music with religious themes.

## ARGUMENT

It is commonly understood that our government, its Constitution, and its laws are founded on a belief in God. Mere acknowledgment of God by the government or government officials cannot be said to be an "establishment of religion" in violation of the Establishment Clause of the United States Constitution.

## I.   BOTH THE NATIONAL MOTTO "IN GOD WE TRUST" AND THE PLEDGE OF ALLEGIANCE ACCURATELY REFLECT THE HISTORICAL FACT THAT THIS NATION WAS FOUNDED UPON A BELIEF IN GOD.

This Nation's Founders based a national philosophy on a belief in Deity. The

Declaration of Independence[4] and the Bill of Rights locate the source of inalienable rights in a Creator rather than in government precisely so that such rights cannot be stripped away by government. In 1782, Thomas Jefferson wrote, "[C]an the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are the gift of God? That they are not to be violated but with His wrath?" Thomas Jefferson, *Notes on Virginia* Q.XVIII (1782). The Founders may have differed over the contours of the relationship between religion and government, but they never deviated from the conviction that "there was a necessary and valuable moral connection between the two."  Philip Hamburger, *Separation of Church and State* 480 (2002).

The nation's history is replete with examples of acknowledgment of religious belief in the public sector. Since the Founding of the Republic,[5] American Presidents have issued Thanksgiving Proclamations establishing a national day of

---

[4] The Declaration of Independence recognizes that human liberties are a gift from God: "all men are created equal, that they are endowed by *their Creator* with certain unalienable Rights." *The Declaration of Independence* para. 2 (U.S. 1776) (emphasis added). Jefferson wrote further that the right to "dissolve the political bands" connecting the Colonies to England derives from Natural Law and "Nature's God." *Id.* para. 1. The Founders also believed that God holds man accountable for his actions as the signers of the Declaration "appeal[ed] to the Supreme Judge of the world to rectify their intentions." *Id.* para. 32. In 1774, Jefferson wrote that "The God who gave us life gave us liberty at the same time; the hand of force may destroy, but cannot disjoin them." Thomas Jefferson, *Rights of British America*, 1774. ME 1:211, Papers 1:135.

[5] The following historical summary was distilled from Justice Kennedy's dissenting opinion in *County of Allegheny v. ACLU*, 492 U.S. 573, 671-72 (1989).

celebration and prayer. At the request of the First Congress, President Washington issued the first such proclamation, in which he wrote that it is the "duty of all nations to acknowledge the providence of Almighty God, to obey His will, to be grateful for His benefits, and humbly to implore His protection and favor." Jared Sparks, *The Writings of George Washington*, Vol. XII, p. T19 (1833-1837). He further "recommend[ed] and assign[ed]" a day "to be devoted by the people of these States to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be," so that "we may then unite in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations, and beseech Him to . . . promote the knowledge and practice of true religion and virtue . . . ." 1 J. Richardson, *A Compilation of Messages and Papers of the Presidents, 1789-1897*, p. 64 (1899).

Most of President Washington's successors followed suit, and the forthrightly religious nature of these proclamations has not waned with the years. President Franklin D. Roosevelt went so far as to "suggest a nationwide reading of the Holy Scriptures during the period from Thanksgiving Day to Christmas" so that "we may bear more earnest witness to our gratitude to Almighty God." Presidential Proclamation No. 2629, 58 Stat. 1160. Similarly, our Presidential inaugurations traditionally have opened with a request for divine blessing. See generally *Inaugural Addresses of the Presidents of the United States*, S. Doc. No.

10, 101st Cong., 1st Sess. (1989).

The Executive has not been the only Branch of our Government to recognize the central role of religion in our society.  Federal courts, including the Supreme Court of the United States, open sessions with the request that "God save the United States and this honorable Court."  The Legislature has gone much further, not only employing legislative chaplains, see 2 U.S.C. § 61d, but also setting aside a special prayer room in the Capitol for use by Members of the House and Senate. The room is decorated with a large stained glass panel that depicts President Washington kneeling in prayer; around him is etched the first verse of the 16th Psalm: "Preserve me, O God, for in Thee do I put my trust." Beneath the panel is a rostrum on which a Bible is placed; next to the rostrum is an American Flag. See L. Aikman, *We the People: The Story of the United States Capitol* 122 (1978).

The United States Code itself contains religious references. Following the historical practice, Congress has directed the President to "issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U.S.C. § 119.[6]  This statute does not

---

[6] On April 17, 1952, President Truman signed Congress's Public Law 324 that marked the first Thursday in May as a day of Prayer. However, this law only established a National Day of Prayer; it did not fix the day, and the day varied according to each president's proclamation date. But, in 1988, Congress amended the law and fixed the date to the first Thursday in May. President Reagan signed

require anyone to pray, but it is a straightforward acknowledgement of the concept of "turn[ing] to God in prayer." Also by statute, the Pledge of Allegiance to the Flag describes the United States as "one Nation under God." Likewise, our national motto, "In God we trust," 36 U.S.C. § 302, is prominently engraved in the wall above the Speaker's dais in the Chamber of the House of Representatives and, by mandate of Congress and the President, see 31 U.S.C. § 5112(d)(1) (1982 ed.), is reproduced on every coin minted and every dollar printed by the Federal Government.

The Motto and Pledge are consistent with the historical recognition of the role of religion in American history.  Indeed, use of the slogan "In God We Trust" dates back to the War of 1812. In September 1814, fearing for the fate of America while watching the British bombardment of Fort McHenry in Baltimore, Francis Scott Key composed the poem the "Star Spangled Banner," of which one line in the final stanza is "And this be our motto—'In God is our trust.'"[7] When Congress codified the longstanding motto in 1956, it articulated a secular purpose of patriotic inspiration: "It will be of great spiritual and psychological value to our country to have a clearly designated national motto of inspirational quality in plain, popularly

---

the amendment into law. *See* Research Report, The Pluralism Project, Harvard University, *available at* http://pluralism.org/research/profiles/display.php?profile=74229.

[7] Steven Epstein, *Rethinking the Constitutionality of Ceremonial Deism,* 96 COLUM. L. REV. 2083, 2122 (1996) (citing George J. Svejda, *History of the Star Spangled Banner From 1814 to the Present* ii (1969)).

accepted English." House Report No. 84-1959, 1956 Cong. & Admin. News, p. 3720.

Likewise, the phrase "one Nation under God" in the Pledge of Allegiance simply describes an indisputable historical fact. As one commentator has observed, the Pledge

> accurately reflects how the founding generation viewed the separation of powers as the surest security of civil right. Anchoring basic rights upon a metaphysical source is very much part of that structural separation, for without God, the law is invited to become god. This was well known to Rousseau and Marx who both complained that acknowledging God creates a competition or check upon the secular state.

Douglas W. Kmiec, *Symposium on Religion in the Public Square: Forward: Oh God! Can I Say that in Public?*, 17 NOTRE DAME J.L. ETHICS & PUB. POL'Y 307, 312-13 (2003).

## II. THE FIRST AMENDMENT DOES NOT COMPEL THE REDACTION OF ALL REFERENCES TO GOD JUST TO SUIT ATHEISTIC PREFERENCES.

It is clear from the Supreme Court's Establishment Clause jurisprudence that the Constitution is not to be interpreted in a manner that would purge religion or religious reference from society. In 1892, the Supreme Court stated that "this is a religious nation." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 470 (1892). The Court has discussed the historical role of religion in our society and concluded that "[t]here is an unbroken history of official acknowledgment by all

three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). In *Abington v. Schempp*, 374 U.S. 203, 212 (1963), the Court recognized that "religion has been closely identified with our history and government." Such recognition of the primacy of religion in the Nation's heritage is nowhere more affirmatively expressed than in *Zorach v. Clauson*, 343 U.S. 306 (1952):

> We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma. When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. *That would be preferring those who believe in no religion over those who do believe*.

*Id*. at 313-14 (emphasis added). Plaintiffs ask this court to do exactly what the Supreme Court warned against in *Zorach*—prefer atheism over religion even to the extent of censoring the historical fact that the United States was founded upon a belief in God.

One fundamental flaw in Plaintiffs' understanding of the Establishment Clause is that they appear to conflate religious expression and patriotic expression.

For example, the Supreme Court consistently has distinguished between religious exercises in public schools, which raise Establishment Clause concerns, and patriotic exercises with religious references, which do not.

In *Engel v. Vitale*, 370 U.S. 421 (1962), where the Court struck down New York State's law requiring school officials to open the school day with prayer, the Court explained:

> There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned *religious exercise* that the State of New York has sponsored in this instance.

*Id.* at 435, n.21 (emphasis added).

Just one year later, in *Schempp*, Justice Goldberg distinguished mandatory Bible reading in public schools from patriotic exercises with religious references:

> The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow.

374 U.S. at 308 (Goldberg, J., concurring).

In *Lee v. Weisman,* 505 U.S. 577 (1992), a decision built in large part on *Engel*, *see* 505 U.S. at 590-92, the Court reaffirmed the distinction it drew in *Engel* between religious exercises such as state-composed prayers and patriotic exercises with religious references:

> We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation. We know too that sometimes to endure social isolation or even anger may be the price of conscience or nonconformity. But, by any reading of our cases, the conformity required of the student in this case was too high an exaction to withstand the test of the Establishment Clause. The *prayer exercises* in this case are especially improper because the State has in every practical sense compelled attendance and participation in an explicit *religious exercise* at an event of singular importance to every student, one the objecting student had no real alternative to avoid.

*Id*. at 597-98 (emphasis added). Quoting with approval the above-cited language from Justice Goldberg's concurrence in *Schempp*, the Court continued:

> Our society would be less than true to its heritage if it lacked abiding concern for the values of its young people, and we acknowledge the profound belief of adherents to many faiths that there must be a place in the student's life for precepts of a morality higher even than the law we today enforce. We express no hostility to those aspirations, nor would our oath permit us to do so. *A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution.* We recognize that, at graduation time and throughout the course of the educational process, there will be instances when religious values, religious practices, and religious persons will have some interaction with the public schools and their students.

*Id*. (citations omitted) (emphasis added).

14

The misused concept of a wall of "separation of church and state" does not assist Plaintiffs' cause. The United States Court of Appeals for the Sixth Circuit recently issued a stinging rebuke of the ACLU's repeated reference to that phrase, stating: "[t]his extra-constitutional construct has grown tiresome. The First Amendment does not demand a wall of separation between church and state. Our Nation's history is replete with governmental acknowledgment and in some cases, accommodation of religion." *ACLU of Kentucky v. Mercer County*, 432 F.3d 624, 638-39 (6th Cir. 2005) (citations omitted). The reasonable observer would not conclude that the government has endorsed religion solely by authorizing the word "God" to appear on money or stating that we are "one nation under God" in the Pledge of Allegiance because "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *See id.* at 639 (quoting *Van Orden v. Perry*, 125 S. Ct. 2854, 2863 (2005) (plurality opinion)). This is because "the reasonable person is not a hyper-sensitive plaintiff. Instead, he appreciates the role religion has played in our governmental institutions, and finds it historically appropriate and traditionally acceptable for a state to include religious influences, even in the form of sacred texts, in honoring American legal traditions." *Id.* at 639-40 (citation omitted). In other words, the mere *recognition* of America's religious heritage does not constitute an impermissible *endorsement* of religion because "[t]o endorse is

15

necessarily to recognize, but the converse does not follow." *Id.* at 639; *see also id.* ("We will not presume endorsement from the mere display of the Ten Commandments.").

Although the primary issue in this case is whether the Establishment Clause prohibits use of "In God We Trust" as the national motto and "under God" in the Pledge, far more is at stake. As the Sixth Circuit has explained, "[i]f the reasonable observer perceived all government references to the Deity as endorsements, then many of our Nation's cherished traditions would be unconstitutional, including the Declaration of Independence and the national motto." *Id.* A decision invalidating the motto would render constitutionally suspect a number of practices that traditionally have been considered an important part of American society. Nothing in the Supreme Court's Establishment Clause jurisprudence requires the relentless extirpation of public references to God that Plaintiffs demand. Whether it be in the national motto, the Pledge of Allegiance, patriotic music, or the nation's founding documents, such references are wholly consistent with the First Amendment.

One of the more obvious casualties of such a holding would be the practice of requiring students to learn and recite passages from many historical documents reflecting the Nation's religious heritage and character. If the government violates the Establishment Clause by inscribing "In God We Trust" on coins and currency, it is difficult to conceive of a rationale by which compelled study or recitation from

16

the Nation's founding documents would not also violate the Constitution. The Mayflower Compact[8] and the Declaration of Independence contain religious references substantiating the fact that America's "institutions presuppose a Supreme Being." *See Zorach*, 343 U.S. at 313; *see also Newdow v. United States Congress*, 328 F.3d 466, 473 (9th Cir. 2003) (O'Scannlain, Kleinfeld, Gould, Tallman, Rawlinson, and Clifton, J.J., dissenting from denial of rehearing en banc). Similarly, the Gettysburg Address, though not a founding document, contains religious language and, historically, has been the subject of required recitations in public schools. President Lincoln declared "that this Nation, *under God*, shall have a new birth of freedom, and that Government of the people, by the people, for the people, shall not perish from the earth." President Abraham Lincoln, *The*

---

[8] The Mayflower Compact, written by William Bradford in 1620, provides:

> We whose names are underwritten, the loyal subjects of our dread sovereign Lord, King James, by *the grace of God*, of Great Britain, France and Ireland king, defender of the faith, etc., having undertaken, *for the glory of God, and advancement of the Christian faith*, and honor of our king and country, a voyage to plant the first colony in the Northern parts of Virginia, do by these presents solemnly and mutually *in the presence of God*, and one of another, covenant and combine ourselves together into a civil body politic, for our better ordering and preservation and furtherance of the ends aforesaid; and by virtue hereof to enact, constitute, and frame such just and equal laws, ordinances, acts, constitutions, and offices, from time to time, as shall be thought most meet and convenient for the general good of the colony, unto which we promise all due submission and obedience.

Mayflower Compact, *available at* http://www.project21.org/MayflowerCompact.html (emphasis added).

*Gettysburg Address* (Nov. 19, 1863) (emphasis added).

Indeed, the references to deity in these historical documents are presumably even more problematic according to the Plaintiffs' reasoning because they proclaim not only God's existence but specific dogma about God—He is involved in the affairs of men; He holds men accountable for their actions; and He is the Author of human liberty. Subscribing to Plaintiffs' position will threaten a sort of Orwellian reformation of civic life by censoring American history.

## III. THE CONSTITUTIONALITY OF THE NATIONAL MOTTO "IN GOD WE TRUST" AND THE REFERENCE TO GOD IN THE PLEDGE OF ALLEGIANCE IS WELL ESTABLISHED IN CASE LAW.

Although the Supreme Court has never decided a case involving the constitutionality of the Motto or the Pledge, numerous pronouncements by past and present members of the Court conclude that neither poses any Establishment Clause problems. In addition, lower courts that have addressed the issues have held that displaying the national motto or requiring the recitation of the Pledge (much less merely displaying it) is constitutional.

### A. The Supreme Court in Dicta Has Specifically Noted the Constitutionality of the National Motto and the Pledge.

In its Establishment Clause jurisprudence, the Supreme Court and individual Justices have suggested on numerous occasions that the Motto and the Pledge do not violate the Establishment Clause. For example, when the Court recently

dismissed a challenge to the Pledge of Allegiance,[9] Justice O'Connor used the

national motto as a constitutional example of "ceremonial deism":

> Given the values that the Establishment Clause was meant to serve,
> however, I believe that government can, in a discrete category of
> cases, acknowledge or refer to the divine without offending the
> Constitution. This category of "ceremonial deism" most clearly
> encompasses such things as the national motto ("In God We Trust"),
> religious references in traditional patriotic songs such as the Star-
> Spangled Banner, and the words with which the Marshal of this Court
> opens each of its sessions ("God save the United States and this
> honorable Court"). These references are not minor trespasses upon the
> Establishment Clause to which I turn a blind eye. Instead, their
> history, character, and context prevent them from being constitutional
> violations at all.

*Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 37 (2004) (O'Connor, J.,

concurring) (internal citations omitted). Justice O'Connor identified four factors

that define an instance of ceremonial deism: 1) its history and ubiquity; 2) the

absence of worship or prayer; 3) the absence of reference to a particular religion;

and 4) minimal religious content or a "highly circumscribed reference to God." *Id.*

at 37-43.

Justice O'Connor continued, acknowledging the historical underpinnings of

such religious references as "In God We Trust":

> Just as the Court has refused to ignore changes in the religious
> composition of our Nation in explaining the modern scope of the
> Religion Clauses . . . it should not deny that our history has left its
> mark on our national traditions. It is unsurprising that a Nation
> founded by religious refugees and dedicated to religious freedom

---

[9] The case was ultimately dismissed for lack of standing.

should find references to divinity in its symbols, songs, mottoes, and oaths.* Eradicating such references would sever ties to a history that sustains this Nation even today.

> \* Note, for example, the following state mottoes: Arizona ("God Enriches"); Colorado ("Nothing without Providence"); Connecticut ("He Who Transplanted Still Sustains"); Florida ("In God We Trust"); Ohio ("With God, All Things Are Possible"); and South Dakota ("Under God the People Rule"). Arizona, Colorado, and Florida have placed their mottoes on their state seals, and the mottoes of Connecticut and South Dakota appear on the flags of those States as well. Georgia's newly-redesigned flag includes the motto "In God We Trust." The oaths of judicial office, citizenship, and military and civil service all end with the (optional) phrase "[S]o help me God." Many of our patriotic songs contain overt or implicit references to the divine, among them: "America" ("Protect us by thy might, great God our King"); "America the Beautiful" ("God shed his grace on thee"); and "God Bless America."

*Id.* at 35-36.

Finally, Justice O'Connor specifically rejected any claim of coercion by virtue of such acts of "ceremonial deism":

> Any coercion that persuades an onlooker to participate in an act of ceremonial deism is inconsequential, as an Establishment Clause matter, because such acts are simply not religious in character. As a result, symbolic references to religion that qualify as instances of ceremonial deism will pass the coercion test as well as the endorsement test. This is not to say, however, that government could *overtly* coerce a person to participate in an act of ceremonial deism.

*Id.* at 44. Justice O'Connor's conclusion regarding the religious import of the phrase "one Nation under God" in the Pledge of Allegiance applies equally to the national motto:

> Whatever the sectarian ends its authors may have had in mind, our

20

> continued repetition of the reference to "one Nation under God" in an exclusively patriotic context has shaped the cultural significance of that phrase to conform to that context. Any religious freight the words may have been meant to carry originally has long since been lost.

*Id.* at 41.

Justice Stevens, writing for the Court, expressed the same sentiments:

> "The very purpose of a national flag is to serve as a symbol of our country." . . . As the history illustrates, the Pledge of Allegiance evolved as a common public acknowledgement of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles.

*Elk Grove*, 542 U.S. at 6 (quoting *Texas v. Johnson*, 491 U.S. 397, 405 (1989))

(citations omitted).

Furthermore, the Establishment Clause is not so broad as to allow mere offense to religious references in patriotic exercises to convert the exercise from patriotic to religious. In fact, Justice O'Connor dismissed such a broad construction of the Establishment Clause in *Elk Grove*, stating that

> distaste for the reference to "one Nation under God," however sincere, cannot be the yardstick of our Establishment Clause inquiry. . . . It would be ironic indeed if this Court were to wield our constitutional commitment to religious freedom so as to sever our ties to the traditions developed to honor it.

*Elk Grove*, 542 U.S. at 44-45 (O'Connor, J., concurring). Justice O'Connor also made it clear that "the Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree. It would betray its own principles if it did;

no robust democracy insulates its citizens from views that they might find novel or even inflammatory." *Id.* at 44.

Justice O'Connor's opinion in *Elk Grove* is consistent with other references, both by her and other members of the Court, concerning the Motto and the Pledge. For example, in his concurring opinion in *Elk Grove*, Chief Justice Rehnquist stated that

> [t]he Constitution only requires that schoolchildren be entitled to abstain from the ceremony if they [choose] to do so. To give the parent of such a child a sort of "heckler's veto" over a patriotic ceremony willingly participated in by other students, simply because the Pledge of Allegiance contains the descriptive phrase "under God," is an unwarranted extension of the Establishment Clause, an extension which would have the unfortunate effect of prohibiting a commendable patriotic observance.

*Id.* at 33 (Rehnquist, C.J., concurring).

In *Lynch*, Justice O'Connor observed that government acknowledgments of religion, such as the declaration of Thanksgiving as a public holiday, printing "In God We Trust" on coins, and opening court sessions with "God Save the United States and this honorable court" could not be reasonably perceived as a government endorsement of religion.

> Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs.

465 U.S. at 693 (O'Connor, J., concurring); *see also County of Allegheny*, 492 U.S. at 603-04 (again expressing the belief that the national motto poses no Establishment Clause problems).

Justice Brennan, perhaps one of the Court's strictest separationists, also thought that the national motto was constitutional:

> [S]uch practices as the designation of "In God We Trust" as our national motto . . . can best be understood . . . as a form of "ceremonial deism" protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content. Moreover, these references are uniquely suited to serve such wholly secular purposes as solemnizing public occasions, or inspiring commitment to meet some national challenge in a manner that simply could not be fully served in our culture if government were limited to purely nonreligious phrases. The practices by which the government has long acknowledged religion are therefore probably necessary to serve certain secular functions, and that necessity, coupled with their long history, gives those practices an essentially secular meaning.

*Lynch,* 465 U.S. at 716-17 (Brennan, J., dissenting) (citations omitted); *see Schempp*, 374 U.S. at 303 (stating the motto is interwoven "so deeply into the fabric of our civil polity that its present use may well not present that type of involvement which the First Amendment prohibits").

In every instance in which the Court or individual Justices have addressed patriotic exercises with religious references, including the Motto and the Pledge, they have concluded unequivocally that those references are constitutional. No Member of the Court, past or current, has suggested otherwise. To the contrary,

23

recognizing that certain of its precedents may create the impression that patriotic exercises with religious references would be constitutionally suspect, the Court has taken pains to assure that such is not the case.

In *Allegheny County*, Justice Blackmun, writing for the Court and joined by Justices Marshall, Brennan, Stevens, and O'Connor, referred directly to the constitutionality of the Motto and the Pledge:

> Our previous opinions have considered in dicta the motto and the pledge, characterizing them as consistent with the proposition that government may not communicate an endorsement of religious belief. We need not return to the subject of "ceremonial deism," . . . because there is an obvious distinction between creche displays and references to God in the motto and the pledge.

492 U.S. at 602-03. The four other Justices in *Allegheny*, Chief Justice Rehnquist and Justices Kennedy, White, and Scalia, explained that striking down traditions like the Motto or the Pledge would be a disturbing departure from the Court's cases upholding the constitutionality of government practices recognizing the nation's religious heritage:

> Taken to its logical extreme, some [statements in the Court's past opinions] would require a relentless extirpation of all contact between government and religion. But that is not the history or the purpose of the Establishment Clause. Government policies of accommodation, acknowledgment, and support for religion are an accepted part of our political and cultural heritage. . . . "[W]e must be careful to avoid the hazards of placing too much weight on a few words or phrases of the Court," and so we have "declined to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history."

24

*Id.* at 657 (Kennedy, J., concurring in part and dissenting in part) (quoting *Walz v. Tax Comm'n of New York City*, 397 U.S. 664, 670-71 (1970)).

**B.    Lower Courts Uniformly Have Upheld the Constitutionality of the National Motto and the Pledge of Allegiance.**

Every lower court that has decided the issue has held that the national motto presents no Establishment Clause concerns, and the majority of lower courts that have decided have held the same regarding the Pledge. This is not surprising, given overwhelming approval of the national motto and the Pledge of Allegiance by the Supreme Court and individual Justices. As the Seventh Circuit stated in *Sherman v. Community Consol. School Dist. 21*, 980 F. 2d 437 (7th Cir. 1992), "If the [Supreme] Court proclaims that a practice is consistent with the establishment clause, we take its assurances seriously. If the Justices are just pulling our leg, let them say so." 980 F.2d at 448. Thus, the Seventh Circuit explained that a mechanistic application of all Establishment Clause tests is unnecessary when the Supreme Court has already spoken so clearly on the issue. *Id.*

The Ninth Circuit sustained the constitutionality of the national motto in *Aronow v. United States*, 432 F. 2d 242 (9th Cir. 1970). Similar to Plaintiffs, the Plaintiff in *Aronow* challenged the constitutionality of federal statutes requiring the national motto to be inscribed on U.S. currency. In a two-page opinion, the Ninth Circuit dismissed the plaintiff's claim, concluding brusquely that

[i]t is quite obvious that the national motto and the slogan on coinage

and currency "In God We Trust" has nothing whatsoever to do with the establishment of religion. Its use is of a patriotic or ceremonial character and bears no true resemblance to a governmental sponsorship of a religious exercise. . . . While "ceremonial" and "patriotic" may not be particularly apt words to describe the category of the national motto, it is excluded from First Amendment significance because the motto has no theological or ritualistic impact.

432 F.2d at 243. Relying on Supreme Court precedent, the court in *Aronow* explained that legislation would only violate the Establishment Clause where its purpose—evidenced facially, through legislative history, or in effect—is to use the state's coercive power to aid religion. *Id.* at 244 (citing *McGowan v. Maryland*, 366 U.S. 420 (1961)). After considering congressional intent[10] and societal impact, the court concluded that the motto had no such purpose. *Id.*

Relying on *Aranow,* the Tenth Circuit also rejected an Establishment Clause challenge to the use of the national motto and its reproduction on United States currency. *Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996). The court in *Gaylor* considered itself bound by the Supreme Court's various dicta on the constitutionality of the national motto "almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Id.* at 217. Applying the *Lemon* test first, the court found that all three parts were easily met:

---

[10] *Id.* ("It will be of great spiritual and psychological value to our country to have a clearly designated national motto of inspirational quality in plain, popularly accepted English." House Report No. 84-1959, 1956 Cong. & Admin. News, p. 3720).

> The statutes establishing the national motto and directing its reproduction on U.S. currency clearly have a secular purpose. The motto symbolizes the historical role of religion in our society, formalizes our medium of exchange, fosters patriotism, and expresses confidence in the future. The motto's primary effect is not to advance religion; instead, it is a form of "ceremonial deism" which through historical usage and ubiquity cannot be reasonably understood to convey government approval of religious belief. Finally, the motto does not create an intimate relationship of the type that suggests unconstitutional entanglement of church and state.

*Id.* at 216 (internal citations omitted). The court then applied the endorsement test, considering the motto and its use on currency from the perspective of the reasonable observer. Noting that a reasonable observer must be deemed to be aware of the purpose, context, and history of the phrase "In God We Trust," the court held that the reasonable observer would not consider its use or its reproduction on U.S. currency to be an endorsement of religion. *Id.* at 217; *cf. ACLU v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 291-310 (6th Cir. 2001) (upholding Ohio's state motto, "In God, All Things Are Possible," against Establishment Clause attack).

A number of district courts have also relied on *Aronow* to hold that the federal statutes requiring the national motto to be printed on the nation's currency are constitutional.[11] In *O'Hair v. Murray*, 462 F. Supp. 19 (W.D. Tex. 1978), *aff'd per curiam*, 588 F.2d 1144 (5th Cir. 1978), the court, in a one-page opinion, quoted

---

[11] In addition, many federal courts have referred in dicta to the probable constitutionality of the national motto. *See, e.g., ACLU v. McCreary County*, 96 F. Supp. 2d 679, 688 (E.D. Ky. 2000).

from Justice Brennan's concurring opinion in *Schempp*, 374 U.S. at 303, and concluded that the national motto "does not infringe on First Amendment rights." *Id.* at 20; *see also Lambeth v. Bd. of Comm'rs*, 321 F. Supp. 2d 688 (M.D.N.C. 2004) (applying *Lemon* and upholding the motto); *Meyers v. Loudoun County Sch. Bd.*, 251 F. Supp. 2d 1262 (E.D. Va. 2003) (relying on *Aronow* and *Gaylor* to hold that the motto's reference to God does not make the statement religious and recognizing Supreme Court dicta stating that the motto does not violate the Constitution); *Schmidt v. Cline*, 127 F. Supp. 2d 1169 (D. Kan. 2000) (relying on *Aronow* and *Gaylor* to hold that plaintiff's Establishment Clause argument was meritless because the motto is not an encouragement of any particular religion). Similarly, in *Opinion of the Justices, Supreme Court of New Hampshire*, 228 A.2d 161, 164 (N.H. 1967), the Supreme Court of New Hampshire advised the New Hampshire Senate that a proposed resolution requiring all public schools to display in every classroom a plaque with the national motto inscribed on it would "not offend the Establishment Clause of the First Amendment."

The Pledge finds similar support in decisions of the lower federal courts. Most significantly, the Seventh Circuit in *Sherman* applied the analysis sketched out above to hold that an Illinois law requiring recitation of the Pledge in public schools does not violate the Establishment Clause. *See* 980 F.2d at 445-48. The court found that the Pledge's reference to God was of a piece with the tradition of

references to God in civic life that stretches back to this nation's founding. See *id.* at 445-56. The court also found that the treatment of the Pledge's reference to God by the Supreme Court and individual Justices foreclosed the conclusion that the Pledge violates the Establishment Clause. *Id.* at 446-48.

Other federal courts have upheld the Pledge from Establishment Clause attacks. The Fourth Circuit, in *Meyers v. Loudon County Public Schools,* 418 F.3d 395 (4th Cir. 2005), upheld a Virginia statute requiring a daily voluntary recitation of the Pledge of Allegiance in schools "[b]ecause the Pledge is not a religious exercise and does not threaten an establishment of religion." *Id.* at 397. The court determined that the Pledge is a "patriotic" exercise. *Id.* at 407. The court stated that "[t]he inclusion of ['under God'] does not alter the *nature* of the Pledge as a patriotic activity." *Id.* Thus, "[e]ven assuming that the recitation of the Pledge contains a risk of indirect coercion, the indirect coercion is not threatening to establish religion, but patriotism." *Id.* at 408.

> The notion that official acknowledgements of religion and its role in the founding of our nation such as that in the Pledge "pose a real danger of establishment of a state church" is simply "farfetched." The Establishment Clause works to bar "sponsorship, financial support, and active involvement of the sovereign in religious activity." The Pledge, which is not a religious exercise, poses none of these harms and does not amount to an establishment of religion.

*Id.* (citations omitted). The Fifth Circuit in dicta has likewise affirmed the patriotic nature of the Pledge, stating, "[r]eferences to God in a motto or pledge, for

example, have withstood constitutional scrutiny; they constitute permissible 'ceremonial deism' and do not give an impression of government approval." *Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 198 (5th Cir. 2006), *vacated on other grounds by* 494 F.3d 494 (5th Cir. 2007) (en banc).

Most recently, a district court in the First Circuit rejected a challenge brought by Plaintiff in this case, the Freedom From Religion Foundation, which objected to the words "under God" in the Pledge and its voluntary recitation in school. *Freedom from Religion Found. v. Hanover Sch. Dist.*, No. 07-cv-356-SM, 2009 U.S. Dist. LEXIS 90555 (D.N.H. Sept. 30, 2009).  The court held that a New Hampshire statute, requiring the Pledge to be administered by school teachers, did not infringe upon the Establishment Clause, but rather, served a secular legislative purpose and "was enacted to enhance instruction in the Nation's history and foster a sense of patriotism."  *Id.* At *21. Citing the analysis in *Meyers*, the court declared the Pledge to be "a civic patriotic statement—an affirmation of adherence to the principles for which the Nation stands." *Id.* at *24.  The court further explained that "the Constitution prohibits the government from establishing a religion . . . . It *does not* mandate that government refrain from all civic, cultural, and historic references to a God." *Id.* at *30 (emphasis added).

Indeed, as Chief Justice Rehnquist noted in *Elk Grove*, the only limitation that the Supreme Court and lower courts have placed on the recitation of the

Pledge is that recitation must be voluntary. 542 U.S. at 30-32 (Rehnquist, C.J., concurring). Requiring involuntary participation violates the First Amendment Free Speech clause. *W. Va. State Bd. of Educ. v. Burnette*, 319 U.S. 624 (1943); *see Circle Sch. v. Pappert*, 381 F.2d 172 (3d Cir. 2004) (requiring a student to obtain a parent's permission before opting out of reciting the Pledge violates the Free Speech Clause); *see also Sherman*, 980 F.2d at 442-44 (holding that an Illinois' statute requiring daily recitation of the Pledge at elementary schools did not violate the Free Speech Clause because the court construed the statute to require only "willing pupils" to recite the Pledge).[12] No such free speech problem exists in this case because merely engraving the Pledge on a building's wall does not require anyone to recite, or even read, the Pledge.

## CONCLUSION

Under existing case law, there is very little upon which to stake an argument that displaying either the national motto or the Pledge of Allegiance violates the Establishment Clause. All authority on point is against such a contention. The

---

[12] The Ninth Circuit, in *Newdow v. Elk Grove Unified Sch. Dist.*, 328 F.3d 466 (9th Cir. 2002), did hold that requiring students to recite the Pledge violates the Establishment Clause because of the Pledge's reference to God. However, the Supreme Court vacated the Ninth Circuit's decision on standing grounds. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004). In any event, the Ninth Circuit's decision in *Newdow* was inconsistent with the Seventh Circuit's decision in *Sherman* as well as the pronouncements we have noted above concerning the Pledge made by the Supreme Court and individual Justices. Therefore, the Ninth Circuit's *Newdow* decision has no bearing on this case.

Establishment Clause was never intended as a guarantee that a person will not be exposed to religion or religious symbols on public property, and the Supreme Court has rejected previous attempts to eradicate all symbols of this country's religious heritage from the public's view. Although enterprising plaintiffs can find support for just about any proposition in the Court's multifarious Establishment Clause pronouncements, a claim that display of the national motto or the Pledge of Allegiance violates the First Amendment borders on frivolous.

For the foregoing reasons, *Amici Curiae* respectfully urge this Court to grant Defendant's motion to dismiss Plaintiffs' claims.

Respectfully submitted this 19th day of November, 2009,

/s/ Geoffrey R. Surtees
Geoffrey R. Surtees
    *Counsel of Record*
AMERICAN CENTER FOR LAW &
    JUSTICE
6375 New Hope Rd.
New Hope, KY 40052
Phone: (502) 549-7020
Fax: (502) 549-7110

Jay Alan Sekulow*
Stuart J. Roth*
Shannon B. Demos*
AMERICAN CENTER FOR LAW &
    JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309

* - Not admitted in this court

*Counsel for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2009, I electronically filed a copy of the foregoing Brief *Amici Curiae* using the ECF System for the Western District of Wisconsin, which will send notification of that filing to all counsel of record in this litigation.

Dated November 19, 2009

/s/ Geoffrey R. Surtees
Geoffrey R. Surtees
*Counsel for Amici*