UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

FREEDOM FROM RELIGION
FOUNDATION, INC.; ANNIE LAURIE GAYLOR;
and DAN BARKER,

        Plaintiffs,

v.                                        Case No. 09-CV-439

STEPHEN AYERS,
ACTING ARCHITECT OF
THE CAPITOL,

        Defendant.

---

### FIRST AMENDED COMPLAINT

---

1.    The plaintiffs allege that Congress' directive to the Architect of the Capitol to engrave the motto "In God We Trust" and the Pledge of Allegiance in prominent places in the Capitol Visitor Center violates the Establishment Clause of the First Amendment to the United States Constitution.

2.    This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

3.    Venue is appropriate in the District Court for the Western District of Wisconsin pursuant to 28 U.S.C. § 1391(e).

4.    The plaintiff, Freedom From Religion Foundation, Inc. ("FFRF"), is a Wisconsin non-stock corporation whose principal office is in Madison, Wisconsin; FFRF is a membership organization working for the separation of church and state and to educate on matters of nontheism.

5. FFRF has more than 14,000 members, including members in every state of the United States and the District of Columbia, who are opposed to government endorsement of religion in violation of the Establishment Clause of the First Amendment to the United States Constitution.

6. FFRF's purposes are to promote the fundamental constitutional principle of separation of church and state and to educate on matters relating to nontheism; FFRF, in its representational capacity, is opposed to government actions that support or give the appearance of endorsement of religion, including by using federal tax appropriations in violation of the Establishment Clause of the First Amendment to the United States Constitution and by engaging in government speech that endorses religion in preference to alternative views of religion; FFRF carries out its purpose, in part, by representing and advocating on behalf of its members.

7. The plaintiff, Annie Laurie Gaylor, resides in Madison, Wisconsin, and she is a lifetime member, co-president, and co-founder of FFRF, and she is the executive editor of FFRF's periodical "Freethought Today," and she is a non-believer who is opposed to governmental endorsement of religion; Ms. Gaylor also is a United States taxpayer and she is opposed to the use of Congressional appropriations in support of religion in violation of the United States Constitution; Ms. Gaylor also is opposed to government speech endorsing religion in preference to alternative views of religion, including the views of nonbelievers.

8. The plaintiff, Dan Barker, also resides in Madison, Wisconsin, and he is a lifetime member of and co-president of FFRF, and he is Public Relations Director of FFRF, and he is a non-believer who is opposed to governmental endorsement of religion; Mr. Barker also is a United States taxpayer and he is opposed to the use of Congressional tax appropriations in

support of religion in violation of the United States Constitution; Mr. Barker also is opposed to government speech endorsing religion in preference to alternative views of religion, including the views of nonbelievers.

9. The defendant, Stephen Ayers, is the acting Architect of the Capitol; he is sued in his official capacity; the office of the defendant, Architect of the Capitol, is located in the Ford House Office Building, H2-205, 2nd and D Street, SW, Washington, DC 20515.

10. The defendant is responsible to the United States Congress for the maintenance, operation, development, and preservation of the United States Capitol Complex, which includes the Capitol, the Congressional office buildings, the Library of Congress buildings, the Supreme Court building, the U.S. Botanic Garden, the Capitol Power Plant, and other facilities, including the Capitol Visitor Center.

11. The defendant is an employee of Congress, but he performs purely administrative and executive-like functions; the defendant does not perform any functions that are part of or integral to the Congressional legislative process and the defendant supervises more than 2,500 employees in performing his responsibilities.

12. Projects under the responsibility of the defendant have included the design, construction and operation of the Capitol Visitor Center.

13. The Capitol Visitor Center was completed under the direction of the defendant on or about December 2, 2008.

14. The Capitol Visitor Center was designed as an extension of the Capitol rather than a stand-alone facility; the Capitol Visitor Center is intended to be and is the sole point of entry to the seat of American government.

15. Congress authorized and funded with taxpayer appropriations the design and construction of the Capitol Visitor Center, which the defendant completed on or about December 2, 2008.

16. The Office of the Architect of the Capitol, under the direction of the defendant, is funded by United States taxpayer appropriations made pursuant to Article I, Sec. 8 of the United States Constitution; the defendant does not have other sources of revenue to pay for required actions.

17. In making appropriations for the Capitol Visitor Center, Congress has expressly directed the defendant, Architect of the Capitol, to engrave "In God We Trust" and the Pledge of Allegiance in prominent places in the Capitol Visitor Center, which is the entrance for the thousands of tourists who visit the Capitol everyday; the Senate approved this resolution on July 6, 2009 as part of an express appropriation bill, while the House of Representatives passed an identical resolution, H. Con. Res. 131, on July 9, 2009; Congress' direction to the defendant constitutes an official enactment by Congress requiring that the defendant take specific action.

18. The Congressional directive to the defendant came in response to criticism of the Capitol Visitor Center by religious organizations for failing to emphasize the alleged role of religion as the basis for the authority and legitimacy of the United States government.

19. Representative Dan Lungren, Republican from California, sponsored the resolution in the House of Representatives, for the express purpose of emphasizing the role of religion in the United States government.

20. Senator Jim DeMint, Republican from South Carolina, sponsored the Senate measure, after threatening to delay the opening of the Capitol Visitor Center in December 2008, ostensibly because the Capitol Visitor Center failed to recognize the purportedly integral role of

religion in our federal government; Senator DeMint stated that the Capitol Visitor Center supposedly gives the impression that the federal government is the answer to all of society's problems, without emphasizing the integration of religion into government as being critical.

21. According to Senator DeMint, the cost to complete the mandated engraving is "worth the trouble" to correct the supposed historical whitewash of the original design and to welcome God back into the Capitol Visitor Center by highlighting the "all important relationship between faith and freedom in America."

22. Congress' directive to the defendant came in response to the initiative of the Congressional Prayer Caucus, which has the purpose to promote the relationship between religion and government, and the Prayer Caucus took aim to achieve that goal with the Capitol Visitor Center.

23. The Congressional Prayer Caucus, under the leadership of Rep. J. Randy Forbes, was formed for the intended purpose to promote the formal acknowledgement of the supposed important role that prayer plays in American life and history.

24. After a year-long effort by the Congressional Prayer Caucus, Rep. Forbes announced in late September of 2009 the unveiling of the engraving of "In God We Trust" in a permanent and prominent location in the Capitol Visitor Center; this was accomplished due to the sustained efforts of the Congressional Prayer Caucus.

25. Rep. Forbes and other Congressmen, including members of the Congressional Prayer Caucus, previously had sought to intimidate the defendant by demanding that he produce all records and documents relating to any displayed content in the Capitol Visitor Center, including changes or additions to design or content that were made in response to requests from

members of Congress, as well as a list of all individuals or groups that consulted on such content and what, if any, changes or additions resulted from these discussions.

26. Rep. Forbes also demanded an "on-the-record meeting" with the defendant and his key staff involved in developing exhibits in the Capitol Visitor Center, along with Rep. Forbes' "expert witnesses."

27. The Congressional legislators, including members of the Congressional Prayer Caucus, who provided the impetus for the directive to the defendant at issue in this case, were motivated by a desire to communicate a religious message underlying the institutions and actions of our government.

28. Rep. Forbes actually attempted to get passed into law a resolution designating the entire first week in May as "America's Spiritual Heritage Week," which purported to recognize "that the religious foundations of faith on which America was built are critical underpinnings of our Nation's most valuable institutions and form the inseparable foundation for America's representative processes, legal systems, and societal structures."

29. Implementing the legislation directing the Architect of the Capitol to engrave the Pledge of Allegiance and the motto "In God We Trust" in prominent locations could only be accomplished subject to the availability of appropriated funds by Congress.

30. The engravings mandated by Congress are perceived as recognizable endorsements of religion, acknowledged by Rep. Mike Pence, who claimed that the Nation's "spiritual heritage was further declared with the unveiling of our national motto 'In God We Trust,' carved in stone in the recently completed Capitol Visitor Center. This motto is now permanently etched in the Center, which now serves as a gateway to the United States Capitol

Building, and it is my [Rep. Spence] hope that this will always be a visible reminder of the faith from which we come and a God who has so greatly blessed our Nation."

31.     The Congressional directive to the defendant to engrave "In God We Trust" and the Pledge of Allegiance in prominent places in the Capitol Visitor Center, in short, was intended to and does give the appearance of preferring a purported "Judeo-Christian" heritage as the basis of the authority and foundational premise of the United States Federal Government, and no other religious or nontheist viewpoints are displayed.

32.     Senator DeMint, in fact, further complained that the Capitol Visitor Center had previously failed to acknowledge that the rights of Americans are endowed by their Creator and stem only from reliance in the first instance on the protection of "Divine Providence."

33.     Representative Steve King of Iowa, and other members of Congress, also complained that the Capitol Visitor Center allegedly portrayed the role of religion as less central than they believed to be appropriate.

34.     According to Representative King, the Capitol Visitor Center, without the engraving of "In God We Trust" and the Pledge of Allegiance, supposedly reflected an effort "to scrub references to America's Christian heritage" and to eradicate "the role of Christianity in America."

35.     The stated purpose of the Capitol Visitor Center, however, is to provide a welcoming and educational environment for visitors to learn about the unique characteristics of the United States House of Representatives and the United States Senate and the legislative process, as well as the history and development of the architecture and art of the Unites States Capitol.

36. The Congressional directive to prominently include religious engravings in the Capitol Visitor Center was intended to and does give the appearance of linking the legislative process to the purported religious beliefs of the members of Congress; the direction to the defendant gives prominent and preferential treatment to the communicated message that the United States institutions of government are supposedly Christian.

37. Representative King, for example, stated prior to passage of the Congressional directive that "our Judeo-Christian heritage is an essential foundation stone" of the United States government.

38. The directive to the defendant to engrave religious messages in prominent places in the Capitol Visitor Center has cost approximately $100,000 - 150,000, funded from U.S. taxpayer appropriations made by Congress, and which expenditure had no intended secular purpose.

39. The specific engravings mandated by Congress evidence a primary and direct effect of advancing religion.

40. The engravings demanded by Congress were intended to endorse religion, and this legislative intent is an important and relevant factor in assessing the perception of a religious display as an endorsement of religion.

41. "In God We Trust," in fact, has not been a United States motto during most of this country's history; America's original motto was purely secular, i.e., "E Pluribus Unum" ("from many come one"), which motto was chosen by Thomas Jefferson, John Adams, and Benjamin Franklin.

42. "In God We Trust" was not recognized by Congress until 1956 and the motto did not appear upon paper currency until 1957.

43. The history of the motto "In God We Trust" evidences no secular purpose; on the contrary, the motto was first adopted during the Cold War as a reaction to the purported "Godlessness" of Communism.

44. "In God We Trust" has no secular purpose; the phrase was adopted precisely to emphasize and endorse a supposed link between the United States federal government and Christian religious belief.

45. The effect of "In God We Trust" is primarily and directly to endorse and promote religion, which endorsement would be unmistakably perceived by a reasonable observer familiar with the history and context of the phrase.

46. "In God We Trust" is intended to and does convey the message that the United States supposedly is a Christian nation.

47. The United States Constitution, however, is not premised on a religious or Christian foundation; the Constitution was very purposefully and deliberately written without such a basis.

48. The phrase "In God We Trust" ultimately was adopted as the result of a religious campaign during the McCarthy-era Congress, intended to create a symbolic unity of "God" with the federal government.

49. The Pledge of Allegiance similarly evidences a history and context of religious endorsement.

50. Only in 1954 did Congress first add the words "under God" to the previously secular pledge.

51. The Pledge of Allegiance originally was used as part of Columbus Day festivities in 1892; the recitation at that time simply stated as follows: "I pledge allegiance to my Flag and to the Republic for which it stands: one Nation indivisible, with Liberty and Justice for all."

52. In 1923, the original words "my Flag" were replaced by the phrase "the Flag of the United States," to which the phrase "of America" was added in 1924.

53. The Pledge of Allegiance was officially adopted by Congress in 1942 in the following form: "I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with Liberty and Justice for all."

54. The Pledge of Allegiance, as statutorily recognized in 1942, included no religious reference.

55. In 1954, however, Congress added the words "under God" to the previously secular pledge, as codified in 4 U.S.C. §4.

56. The legislative history of the 1954 Congressional Act clearly evidences the underlying purpose to endorse Christian monotheism, while disapproving of atheism; the Report accompanying the 1954 Act clearly enunciated this purpose: "The inclusion of God in the pledge, therefore, would further acknowledge the dependence of our people and our government upon the moral directions of the Creator."

57. Congress also intended in 1954 to denigrate atheism, as further stated in the Congressional Report accompanying the legislation: "The inclusion of God in the pledge . . . would serve to deny the atheistic and materialistic concepts of communism."

58. The Congressional directive to the defendant to prominently engrave "In God We Trust" and the Pledge of Allegiance at the entrance to the Capitol Visitor Center, at taxpayer expense, violated the fundamental principle of the separation of church and state by using

Congressional taxpayer appropriations, made pursuant to the Taxing and Spending provision of the Constitution, to support government speech that endorses religion.

59. The Congressional directive to the defendant, as implemented, gives the appearance of the government's official support for and advocacy of religion, including because of the specific legislative history and intent of Congress in directing the defendant to prominently display such government speech.

60. The direct and primary effect of Congress' directive to the defendant gives support to and the appearance of the endorsement of religion.

61. The use by the defendant of Congressional appropriations, made pursuant to Article 1, Section 8, of the United States Constitution gives actual and apparent government endorsement and advancement of religion; the defendant's claim that the mandate from Congress was unfunded, moreover, is specious and constitutes a sham because the defendant necessarily had to use taxpayer appropriations to comply with Congress' express directive.

62. "In God We Trust" excludes and treats as outsiders the millions of Americans, including as many as 15% of all adults, who are not religious, i.e., atheists, agnostics, skeptics and freethinkers, none of whom possess a belief in a god; the mandated language diminishes non-believers by making god-belief synonymous with citizenship.

63. A reasonable observer familiar with the history and context of Congress' directive to prominently engrave specific religious displays in the Capitol Visitor Center understands the government to be endorsing religion, including a Judeo-Christian perspective, while discouraging non-belief.

64. The directive necessarily required the defendant to utilize Congressional taxpayer appropriations to endorse and advance religion, which violates the Establishment Clause of the First Amendment to the United States Constitution.

65. The Congressional directive to the defendant, implemented with Congressional tax appropriations, is injurious to the interests of the plaintiffs individually, and to FFRF in its representative capacity, because the Congressional directive compels the plaintiffs to support the establishment, endorsement and advancement of religion, to which they object; the directive conveys a message that secular Americans are second class citizens.

66. The defendant's implementation of the Congressional directive has resulted in the prominent display of government speech that discriminates in favor of, endorses and promotes religion.

67. The government speech at issue in this case evidences a preference for a religious point of view as compared to the point of view of non-believers.

68. Preferential treatment of government speech endorsing religion, as opposed to the viewpoint of the plaintiffs, who oppose the government's preference for a religious point of view, constitutes discriminatory treatment that is a harm sufficiently particular to qualify as an actual injury for standing purposes.

69. Where, as here, the plaintiffs challenge the defendant's actions on the ground that the defendant has promoted a viewpoint above their own, as to the promotion of prayer and religion, the plaintiffs suffer a cognizable injury that can be redressed by the court.

70. Government speech endorsing religion is prohibited by the Establishment Clause, in contrast to private speech endorsing religion, and as a result, the defendant may not articulate and display government speech that promotes a religious viewpoint in contrast to the

viewpoint of the plaintiffs, who have variously requested at different times countervailing speech.

71. The government speech at issue in this case, funded by taxpayer appropriations under Article I, Section 8, of the United States Constitution, constitutes a compelled-subsidy, pursuant to which the plaintiffs are required by the government to subsidize a message with which they disagree and which speech is otherwise prohibited by the Establishment Clause.

72. The plaintiffs, as taxpayers, have standing to challenge the compelled subsidization of prohibited speech under the Constitution, unlike a situation involving government speech that is not prohibited under the Constitution.

73. The compelled support of government, even as to those programs that one does not approve, is generally constitutional under the rule recognizing that funds raised by the government inevitably will be spent for speech and other expression to advocate and defend the government's own policies, regardless of the approval or disapproval of each taxpayer; as a general rule, government speech cannot be challenged by disapproving taxpayers.

74. Not all government speech is immune from constitutional scrutiny, however, including government speech endorsing religion, as alleged in the present case.

75. The speech at issue is, from beginning to end, a message established by the federal government, thereby quintessentially constituting government speech.

76. A compelled subsidy of prohibited speech may be challenged regardless whether the funds used for the speech are raised by general taxes or through a targeted assessment.

77. Taxpayers may challenge compelled support of prohibited government speech, just as they may challenge compelled support of private speech, and this is no less true when the

funding is achieved through targeted assessments devoted exclusively to the program to which the assessed taxpayers object, or through general taxes.

78. In a compelled-subsidy case, the taxpayers' injury does not stem from the government's mode of accounting, but rather arises from the misuse of government tax appropriations for a prohibited purpose.

79. In the case of a compelled-subsidy, not every instance of government speech must be funded by a line item in an appropriations bill, particularly where the challenged speech is required by Congress, as in this case.

80. The plaintiffs have suffered a concrete and cognizable injury based on their challenge to the directive by Congress to preferentially promote an opposing viewpoint above the plaintiffs' own viewpoint, regarding prayer and religion, which preference is expressed using a compelled subsidy from the plaintiffs.

81. The speech required in the Capitol Visitor Center by Congress constitutes speech directed by Congress that discriminates in favor of a Christian perspective.

82. The government speech required by Congress for the Capitol Visitor Center is intended to convey, and it does convey, a message that the United States is a Christian nation.

83. The United States, in fact, is not a Christian nation whose institutions embody any religious dogma.

84. The viewpoint discrimination made explicit by Congress' directive to the defendant is prohibited because it promotes and encourages religion, which is prohibited by the Establishment Clause.

85. Government speech encouraging and promoting religion shows prohibited advocacy of a viewpoint preference, which viewpoint cannot be funded by compelled subsidies.

86. Finally, reliance on Congressional endorsements of government speech, such as the Pledge of Allegiance, is not controlling or even persuasive as to the constitutionality of such speech.

87. Congress exceeded its constitutional authority by promulgating and mandating speech that endorses religion, which speech is administered and conveyed in this case by the defendant.

88. The federal courts, moreover, have the role of determining the constitutionality of Congress' directive to the defendant, which directive the plaintiffs allege to be in violation of the Establishment Clause.

89. Here, Congress' directive to the defendant is unconstitutional because it requires non-believers to pay for speech that violates their freedom of conscience, all in violation of the Establishment Clause, and the compelled subsidy by the plaintiffs arises in this jurisdictional district, from which the plaintiffs issue their federal tax payments.

WHEREFORE, the plaintiffs demand judgment as follows:

(a) For judgment declaring that the Congressional directive to the defendant to engrave "In God We Trust" and the Pledge of Allegiance at the entrance of the Capitol Visitor Center violates the Establishment Clause of the First Amendment to the United States Constitution;

(b) For an order prohibiting the defendant from continuing to prominently display "In God We Trust" and the Pledge of Allegiance in the Capitol Visitor Center;

(c) For judgment awarding such further relief as the Court deems just and equitable; and

(d)   For judgment awarding the plaintiffs their reasonable costs, disbursements and attorneys' fees, as allowed by law.

Dated this 8th day of December, 2009.

BOARDMAN, SUHR, CURRY & FIELD LLP
By

_/s/ Richard L. Bolton_
Richard L. Bolton
Wisconsin State Bar No. 1012552
1 South Pinckney Street, 4th Floor
P. O. Box 927
Madison, WI 53701-0927
Telephone: (608) 257-9521
Facsimile: (608) 283-1709
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification electronically to all attorneys of record.

_/s/Rosalie G. Stapleton_
Rosalie G. Stapleton

F:\DOCS\wd\26318\24\A0930914.DOC