UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

FREEDOM FROM RELIGION
FOUNDATION, INC.; ANNIE LAURIE GAYLOR;
and DAN BARKER,

              Plaintiffs,

v.                                              Case No. 09-CV-439

STEPHEN AYERS,
ACTING ARCHITECT OF
THE CAPITOL,

              Defendant.

## PLAINTIFFS' BRIEF IN OPPOSITION TO MOTION TO DISMISS

## I.  INTRODUCTION.

The defendant argues that he can only be sued, as an officer of the Legislative Branch
of the Federal Government, in the District Court for the District of Columbia.  He further
argues that the plaintiffs lack standing and that he has absolute sovereign immunity.  Finally,
if the Court finds jurisdiction to exist, the defendant argues that plaintiffs' Complaint fails on
the merits because government engravings of the Pledge of Allegiance and the National
Motto allegedly are Constitutional per se, regardless of the history and Congressional
motivation for directing such engravings.

The plaintiffs oppose the defendant's Motion to Dismiss.  First, the plaintiffs disagree
with the defendant's claim that he can only be sued in the District Court for the District of
Columbia, even as to alleged Constitutional violations committed in an administrative
capacity.  The plaintiffs, nonetheless, do not contest the defendant's objection to this matter

being heard in the Western District of Wisconsin. Instead of dismissal, followed by refiling in the D. C. District Court, however, the plaintiffs request this District Court to transfer the pending matter to the D.C. District Court pursuant to 28 U.S.C. §1406.

The plaintiffs further oppose in all respects the defendant's Motion to Dismiss on the basis that they allegedly lack taxpayer standing. In this case, Congress both directed the alleged unconstitutional action of the defendant and funded his actions with taxpayer appropriations. Congress' responsibility for directing the alleged unconstitutional use of taxpayer appropriations, therefore, is undisputed. This case is distinguishable, therefore, from those in which the Executive Branch of the Federal Government made independent discretionary determinations to use Congressional taxpayer appropriations in violation of the Constitution.

Finally, the defendant incorrectly argues that he has absolute sovereign immunity for even allegedly unconstitutional conduct. The claim that Federal officials cannot be held accountable for alleged unconstitutional conduct unless Congress agrees to such accountability is contrary to law. At least since Marbury v. Madison, 1 Cranch 137 (1803), the law has recognized that Federal officials may be sued in Federal Court to compel Constitutional accountability.

The defendant ultimately advocates a degree of Constitutional unaccountability that is supposedly greater for the Legislative Branch of the Federal Government than for the Executive Branch. In fact, however, the direct nexus between Congress' alleged unconstitutional directive in this case, and Congressional funding, militates more strongly in favor of judicial accountability, rather than against such accountability. Here, the Congressional responsibility for directing the misuse of taxpayer appropriations is direct and

2

unatenuated by any intervening discretionary decisions of other Branches of the Federal Government. The defendant's Motion to Dismiss, therefore, should be denied.

## II.  **ALLEGATIONS OF THE AMENDED COMPLAINT.**

1.      The plaintiffs allege that Congress' directive to the Architect of the Capitol to engrave the motto "In God We Trust" and the Pledge of Allegiance in prominent places in the Capitol Visitor Center violates the Establishment Clause of the First Amendment to the United States Constitution.

2.      This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Venue is appropriate in the District Court for the Western District of Wisconsin pursuant to 28 U.S.C. § 1391(e).

4.      The plaintiff, Freedom From Religion Foundation, Inc. ("FFRF"), is a Wisconsin non-stock corporation whose principal office is in Madison, Wisconsin; FFRF is a membership organization working for the separation of church and state and to educate on matters of nontheism.

5.      FFRF has more than 14,000 members, including members in every state of the United States and the District of Columbia, who are opposed to government endorsement of religion in violation of the Establishment Clause of the First Amendment to the United States Constitution.

6.      FFRF's purposes are to promote the fundamental constitutional principle of separation of church and state and to educate on matters relating to nontheism; FFRF, in its representational capacity, is opposed to government actions that support or give the appearance of endorsement of religion, including by using federal tax appropriations in violation of the Establishment Clause of the First Amendment to the United States Constitution and by

3

engaging in government speech that endorses religion in preference to alternative views of religion; FFRF carries out its purpose, in part, by representing and advocating on behalf of its members.

7.     The plaintiff, Annie Laurie Gaylor, resides in Madison, Wisconsin, and she is a lifetime member, co-president, and co-founder of FFRF, and she is the executive editor of FFRF's periodical "Freethought Today," and she is a non-believer who is opposed to governmental endorsement of religion; Ms. Gaylor also is a United States taxpayer and she is opposed to the use of Congressional appropriations in support of religion in violation of the United States Constitution; Ms. Gaylor also is opposed to government speech endorsing religion in preference to alternative views of religion, including the views of nonbelievers.

8.     The plaintiff, Dan Barker, also resides in Madison, Wisconsin, and he is a lifetime member of and co-president of FFRF, and he is Public Relations Director of FFRF, and he is a non-believer who is opposed to governmental endorsement of religion; Mr. Barker also is a United States taxpayer and he is opposed to the use of Congressional tax appropriations in support of religion in violation of the United States Constitution; Mr. Barker also is opposed to government speech endorsing religion in preference to alternative views of religion, including the views of nonbelievers.

9.     The defendant, Stephen Ayers, is the acting Architect of the Capitol; he is sued in his official capacity; the office of the defendant, Architect of the Capitol, is located in the Ford House Office Building, H2-205, 2nd and D Street, SW, Washington, DC 20515.

10.     The defendant is responsible to the United States Congress for the maintenance, operation, development, and preservation of the United States Capitol Complex, which includes the Capitol, the Congressional office buildings, the Library of Congress buildings, the Supreme

4

Court building, the U.S. Botanic Garden, the Capitol Power Plant, and other facilities, including the Capitol Visitor Center.

11. The defendant is an employee of Congress, but he performs purely administrative and executive-like functions; the defendant does not perform any functions that are part of or integral to the Congressional legislative process and the defendant supervises more than 2,500 employees in performing his responsibilities.

12. Projects under the responsibility of the defendant have included the design, construction and operation of the Capitol Visitor Center.

13. The Capitol Visitor Center was completed under the direction of the defendant on or about December 2, 2008.

14. The Capitol Visitor Center was designed as an extension of the Capitol rather than a stand-alone facility; the Capitol Visitor Center is intended to be and is the sole point of entry to the seat of American government.

15. Congress authorized and funded with taxpayer appropriations the design and construction of the Capitol Visitor Center, which the defendant completed on or about December 2, 2008.

16. The Office of the Architect of the Capitol, under the direction of the defendant, is funded by United States taxpayer appropriations made pursuant to Article I, Sec. 8 of the United States Constitution; the defendant does not have other sources of revenue to pay for required actions.

17. In making appropriations for the Capitol Visitor Center, Congress has expressly directed the defendant, Architect of the Capitol, to engrave "In God We Trust" and the Pledge of Allegiance in prominent places in the Capitol Visitor Center, which is the entrance for the

5

thousands of tourists who visit the Capitol every day; the Senate approved this resolution on July 6, 2009 as part of an express appropriation bill, while the House of Representatives passed an identical resolution, H. Con. Res. 131, on July 9, 2009; Congress' direction to the defendant constitutes an official enactment by Congress requiring that the defendant take specific action.

18.    The Congressional directive to the defendant came in response to criticism of the Capitol Visitor Center by religious organizations for failing to emphasize the alleged role of religion as the basis for the authority and legitimacy of the United States government.

19.    Representative Dan Lungren, Republican from California, sponsored the resolution in the House of Representatives, for the express purpose of emphasizing the role of religion in the United States government.

20.    Senator Jim DeMint, Republican from South Carolina, sponsored the Senate measure, after threatening to delay the opening of the Capitol Visitor Center in December 2008, ostensibly because the Capitol Visitor Center failed to recognize the purportedly integral role of religion in our federal government; Senator DeMint stated that the Capitol Visitor Center supposedly gives the impression that the federal government is the answer to all of society's problems, without emphasizing the integration of religion into government as being critical.

21.    According to Senator DeMint, the cost to complete the mandated engraving is "worth the trouble" to correct the supposed historical whitewash of the original design and to welcome God back into the Capitol Visitor Center by highlighting the "all important relationship between faith and freedom in America."

22.    Congress' directive to the defendant came in response to the initiative of the Congressional Prayer Caucus, which has the purpose to promote the relationship between

6

religion and government, and the Prayer Caucus took aim to achieve that goal with the Capitol Visitor Center.

23.     The Congressional Prayer Caucus, under the leadership of Rep. J. Randy Forbes, was formed for the intended purpose to promote the formal acknowledgement of the supposed important role that prayer plays in American life and history.

24.     After a year-long effort by the Congressional Prayer Caucus, Rep. Forbes announced in late September of 2009 the unveiling of the engraving of "In God We Trust" in a permanent and prominent location in the Capitol Visitor Center; this was accomplished due to the sustained efforts of the Congressional Prayer Caucus.

25.     Rep. Forbes and other Congressmen, including members of the Congressional Prayer Caucus, previously had sought to intimidate the defendant by demanding that he produce all records and documents relating to any displayed content in the Capitol Visitor Center, including changes or additions to design or content that were made in response to requests from members of Congress, as well as a list of all individuals or groups that consulted on such content and what, if any, changes or additions resulted from these discussions.

26.     Rep. Forbes also demanded an "on-the-record meeting" with the defendant and his key staff involved in developing exhibits in the Capitol Visitor Center, along with Rep. Forbes' "expert witnesses."

27.     The Congressional legislators, including members of the Congressional Prayer Caucus, who provided the impetus for the directive to the defendant at issue in this case, were motivated by a desire to communicate a religious message underlying the institutions and actions of our government.

28.     Rep. Forbes actually attempted to get passed into law a resolution designating the entire first week in May as "America's Spiritual Heritage Week," which purported to recognize "that the religious foundations of faith on which America was built are critical underpinnings of our Nation's most valuable institutions and form the inseparable foundation for America's representative processes, legal systems, and societal structures."

29.     Implementing the legislation directing the Architect of the Capitol to engrave the Pledge of Allegiance and the motto "In God We Trust" in prominent locations could only be accomplished subject to the availability of appropriated funds by Congress.

30.     The engravings mandated by Congress are perceived as recognizable endorsements of religion, acknowledged by Rep. Mike Pence, who claimed that the Nation's "spiritual heritage was further declared with the unveiling of our national motto 'In God We Trust,' carved in stone in the recently completed Capitol Visitor Center.  This motto is now permanently etched in the Center, which now serves as a gateway to the United States Capitol Building, and it is my [Rep. Spence] hope that this will always be a visible reminder of the faith from which we come and a God who has so greatly blessed our Nation."

31.     The Congressional directive to the defendant to engrave "In God We Trust" and the Pledge of Allegiance in prominent places in the Capitol Visitor Center, in short, was intended to and does give the appearance of preferring a purported "Judeo-Christian" heritage as the basis of the authority and foundational premise of the United States Federal Government, and no other religious or nontheist viewpoints are displayed.

32.     Senator DeMint, in fact, further complained that the Capitol Visitor Center had previously failed to acknowledge that the rights of Americans are endowed by their Creator and stem only from reliance in the first instance on the protection of "Divine Providence."

8

33.     Representative Steve King of Iowa, and other members of Congress, also complained that the Capitol Visitor Center allegedly portrayed the role of religion as less central than they believed to be appropriate.

34.     According to Representative King, the Capitol Visitor Center, without the engraving of "In God We Trust" and the Pledge of Allegiance, supposedly reflected an effort "to scrub references to America's Christian heritage" and to eradicate "the role of Christianity in America."

35.     The stated purpose of the Capitol Visitor Center, however, is to provide a welcoming and educational environment for visitors to learn about the unique characteristics of the United States House of Representatives and the United States Senate and the legislative process, as well as the history and development of the architecture and art of the Unites States Capitol.

36.     The Congressional directive to prominently include religious engravings in the Capitol Visitor Center was intended to and does give the appearance of linking the legislative process to the purported religious beliefs of the members of Congress; the direction to the defendant gives prominent and preferential treatment to the communicated message that the United States institutions of government are supposedly Christian.

37.     Representative King, for example, stated prior to passage of the Congressional directive that "our Judeo-Christian heritage is an essential foundation stone" of the United States government.

38.     The directive to the defendant to engrave religious messages in prominent places in the Capitol Visitor Center has cost approximately $100,000 - 150,000, funded from U.S.

9

taxpayer appropriations made by Congress, and which expenditure had no intended secular purpose.

39.     The specific engravings mandated by Congress evidence a primary and direct effect of advancing religion.

40.     The engravings demanded by Congress were intended to endorse religion, and this legislative intent is an important and relevant factor in assessing the perception of a religious display as an endorsement of religion.

41.     "In God We Trust," in fact, has not been a United States motto during most of this country's history; America's original motto was purely secular, i.e., "E Pluribus Unum" ("from many come one"), which motto was chosen by Thomas Jefferson, John Adams, and Benjamin Franklin.

42.     "In God We Trust" was not recognized by Congress until 1956 and the motto did not appear upon paper currency until 1957.

43.     The history of the motto "In God We Trust" evidences no secular purpose; on the contrary, the motto was first adopted during the Cold War as a reaction to the purported "Godlessness" of Communism.

44.     "In God We Trust" has no secular purpose; the phrase was adopted precisely to emphasize and endorse a supposed link between the United States federal government and Christian religious belief.

45.     The effect of "In God We Trust" is primarily and directly to endorse and promote religion, which endorsement would be unmistakably perceived by a reasonable observer familiar with the history and context of the phrase.

10

46.     "In God We Trust," as used is intended to and does convey the message that the United States supposedly is a Christian nation paying homage to the God referenced in the Judeo-Christian scriptures.

47.     The United States Constitution, however, is not premised on a religious or Christian foundation; the Constitution was very purposefully and deliberately written without such a basis.

48.     The phrase "In God We Trust" ultimately was adopted as the result of a religious campaign during the McCarthy-era Congress, intended to create a symbolic unity of "God" with the federal government.

49.     The Pledge of Allegiance similarly evidences a history and context of religious endorsement.

50.     Only in 1954 did Congress first add the words "under God" to the previously secular pledge.

51.     The Pledge of Allegiance originally was used as part of Columbus Day festivities in 1892; the recitation at that time simply stated as follows: "I pledge allegiance to my Flag and to the Republic for which it stands: one Nation indivisible, with Liberty and Justice for all."

52.     In 1923, the original words "my Flag" were replaced by the phrase "the Flag of the United States," to which the phrase "of America" was added in 1924.

53.     The Pledge of Allegiance was officially adopted by Congress in 1942 in the following form: "I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with Liberty and Justice for all."

54.     The Pledge of Allegiance, as statutorily recognized in 1942, included no religious reference.

11

55. In 1954, however, Congress added the words "under God" to the previously secular pledge, as codified in 4 U.S.C. §4.

56. The legislative history of the 1954 Congressional Act clearly evidences the underlying purpose to endorse Christian monotheism, while disapproving of atheism; the Report accompanying the 1954 Act clearly enunciated this purpose: "The inclusion of God in the pledge, therefore, would further acknowledge the dependence of our people and our government upon the moral directions of the Creator."

57. Congress also intended in 1954 to denigrate atheism, as further stated in the Congressional Report accompanying the legislation: "The inclusion of God in the pledge . . . would serve to deny the atheistic and materialistic concepts of communism."

58. The Congressional directive to the defendant to prominently engrave "In God We Trust" and the Pledge of Allegiance at the entrance to the Capitol Visitor Center, at taxpayer expense, violated the fundamental principle of the separation of church and state by using Congressional taxpayer appropriations, made pursuant to the Taxing and Spending provision of the Constitution, to support government speech that endorses religion.

59. The Congressional directive to the defendant, as implemented, gives the appearance of the government's official support for and advocacy of religion, including because of the specific legislative history and intent of Congress in directing the defendant to prominently display such government speech.

60. The direct and primary effect of Congress' directive to the defendant gives support to and the appearance of the endorsement of religion.

61. The use by the defendant of Congressional appropriations, made pursuant to Article 1, Section 8, of the United States Constitution gives actual and apparent government

12

endorsement and advancement of religion; the defendant's claim that the mandate from Congress was unfunded, moreover, is specious and constitutes a sham because the defendant necessarily had to use taxpayer appropriations to comply with Congress' express directive.

62.    "In God We Trust" excludes and treats as outsiders the millions of Americans, including as many as 15% of all adults, who are not religious, i.e., atheists, agnostics, skeptics and freethinkers, none of whom possesses a belief in a god; the mandated language diminishes non-believers by making god-belief synonymous with citizenship.

63.    A reasonable observer familiar with the history and context of Congress' directive to prominently engrave specific  religious displays in the Capitol Visitor Center understands the government to be endorsing religion, including a Judeo-Christian perspective, while discouraging non-belief.

64.    The directive necessarily required the defendant to utilize Congressional taxpayer appropriations to endorse and advance religion, which violates the Establishment Clause of the First Amendment to the United States Constitution.

65.    The Congressional directive to the defendant, implemented with Congressional tax appropriations, is injurious to the interests of the plaintiffs individually, and to FFRF in its representative capacity, because the Congressional directive compels the plaintiffs to support the establishment, endorsement and advancement of religion, to which they object; the directive conveys a message that secular Americans are second class citizens.

66.    The defendant's implementation of the Congressional directive has resulted in the prominent display of government speech that discriminates in favor of, endorses and promotes religion.

13

67.     The government speech at issue in this case evidences a preference for a religious point of view as compared to the point of view of non-believers.

68.     Preferential treatment of government speech endorsing religion, as opposed to the viewpoint of the plaintiffs, who oppose the government's preference for a religious point of view, constitutes discriminatory treatment that is a harm sufficiently particular to qualify as an actual injury for standing purposes.

69.     Where, as here, the plaintiffs challenge the defendant's actions on the ground that the defendant has promoted a viewpoint above their own, as to the promotion of prayer and religion, the plaintiffs suffer a cognizable injury that can be redressed by the court.

70.     Government speech endorsing religion is prohibited by the Establishment Clause, in contrast to private speech endorsing religion, and as a result, the defendant may not articulate and display government speech that promotes a religious viewpoint in contrast to the viewpoint of the plaintiffs, who have variously requested at different times countervailing speech.

71.     The government speech at issue in this case, funded by taxpayer appropriations under Article I, Section 8, of the United States Constitution, constitutes a compelled-subsidy, pursuant to which the plaintiffs are required by the government to subsidize a message with which they disagree and which speech is otherwise prohibited by the Establishment Clause.

72.     The plaintiffs, as taxpayers, have standing to challenge the compelled subsidization of prohibited speech under the Constitution, unlike a situation involving government speech that is not prohibited under the Constitution.

73.     The compelled support of government, even as to those programs that one does not approve, is generally constitutional under the rule recognizing that funds raised by the

14

government inevitably will be spent for speech and other expression to advocate and defend the government's own policies, regardless of the approval or disapproval of each taxpayer; as a general rule, government speech cannot be challenged by disapproving taxpayers.

74.    Not all government speech is immune from constitutional scrutiny, however, including government speech endorsing religion, as alleged in the present case.

75.    The speech at issue is, from beginning to end, a message established by the federal government, thereby quintessentially constituting government speech.

76.    A compelled subsidy of prohibited speech may be challenged regardless whether the funds used for the speech are raised by general taxes or through a targeted assessment.

77.    Taxpayers may challenge compelled support of prohibited government speech, just as they may challenge compelled support of private speech, and this is no less true when the funding is achieved through targeted assessments devoted exclusively to the program to which the assessed taxpayers object, or through general taxes.

78.    In a compelled-subsidy case, the taxpayers' injury does not stem from the government's mode of accounting, but rather arises from the misuse of government tax appropriations for a prohibited purpose.

79.    In the case of a compelled-subsidy, not every instance of government speech must be funded by a line item in an appropriations bill, particularly where the challenged speech is required by Congress, as in this case.

80.    The plaintiffs have suffered a concrete and cognizable injury based on their challenge to the directive by Congress to preferentially promote an opposing viewpoint above the plaintiffs' own viewpoint, regarding prayer and religion, which preference is expressed using a compelled subsidy from the plaintiffs.

81.     The speech required in the Capitol Visitor Center by Congress constitutes speech directed by Congress that discriminates in favor of a Christian perspective.

82.     The government speech required by Congress for the Capitol Visitor Center is intended to convey, and it does convey, a message that the United States is a Christian nation.

83.     The United States, in fact, is not a Christian nation whose institutions embody any religious dogma.

84.     The viewpoint discrimination made explicit by Congress' directive to the defendant is prohibited because it promotes and encourages religion, which is prohibited by the Establishment Clause.

85.     Government speech encouraging and promoting religion shows prohibited advocacy of a viewpoint preference, which viewpoint cannot be funded by compelled subsidies.

86.     Finally, reliance on Congressional endorsements of government speech, such as the Pledge of Allegiance, is not controlling or even persuasive as to the constitutionality of such speech.

87.     Congress exceeded its constitutional authority by promulgating and mandating speech that endorses religion, which speech is administered and conveyed in this case by the defendant.

88.     The federal courts, moreover, have the role of determining the constitutionality of Congress' directive to the defendant, which directive the plaintiffs allege to be in violation of the Establishment Clause.  Here, Congress' directive to the defendant is unconstitutional because it requires non-believers to pay for speech that violates their freedom of conscience, all in violation of the Establishment Clause, and the compelled subsidy by the plaintiffs arises in this jurisdictional district, from which the plaintiffs issue their federal tax payments.

89.    Here, Congress' directive to the defendant is unconstitutional because it requires non-believers to pay for speech that violates their freedom of conscience, all in violation of the Establishment Clause, and the compelled subsidy by the plaintiffs arises in this jurisdictional district, from which the plaintiffs issue their federal tax payments.

### III.  THE COURT HAS JURISDICTION OVER THE DEFENDANT AND VENUE IS APPROPRIATE HERE, BUT THE PLAINTIFFS DO NOT CONTEST TRANSFER TO THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA.

The defendant claims that the Court lacks personal jurisdiction because he is an officer and employee of the Legislative Branch of the Federal Government.  According to the defendant, 28 U.S.C. §1391(e)(3) only establishes a basis for personal jurisdiction over employees of the Executive Branch of Government.  The defendant, however, as the Architect of the Capitol, does not perform legislative functions.  Instead, he performs purely executive and administrative functions, bringing him within the intended scope of §1391(e). In order to avoid an unnecesary dispute over this issue, however, the plaintiffs are agreeable that this Court may transfer the pending action to the District Court for the District of Columbia.

Section 1391(e) provides that a civil action in which a defendant is an officer or employee of the United States may be brought in any judicial district in which:

(1)    A defendant in the action resides; or

(2)    The cause of action arose; or

(3)    Any real property involved in the action is situated; or

(4)    The plaintiff resides if no real property is involved in the action.

17

The plaintiffs reside in the Western District of Wisconsin, and a federal defendant is named, so §1391(e) would appear to support venue here. By judicial construction, however, the defendant argues that §1391(e) provides only a basis for personal jurisdiction and venue as to officers and employees of the Executive Branch of the Federal Government. The defendant, nonetheless, does not contend that he performs any legislative functions as the Architect of the Capitol.

The defendant cites decisions construing §1391(e) in which personal jurisdiction was denied on the basis of §1391(e) involving federal officials and employees of the Legislative Branch. In Liberation News v. Eastland, 426 F.2d 1379 (2d Cir. 1970), for example, the Court of Appeals for the Second Circuit considered the scope and history of §1391(e), which was intended to address the "mischief" rising from the fact that the lower federal courts generally lacked jurisdiction to issue writs of mandamus to federal officers. Id at 1383. The Court concluded, however, that the intention of the legislation was to facilitate review by the federal courts of "administrative actions." Id. By contrast, the Court concluded that the Legislature, including Congressional Committees, operate predominantly in the Capitol so that substantial "disruption to the work of Congress by the pendency of actions elsewhere than in Washington could be far more serious than in the case of Executive departments and agencies with their large staffs." Id at 1384.

In Duplantier v. United States, 606 F2d 654 (5th Cir.), the United States Court of Appeals for the Fifth Circuit further considered whether §1391(e) provided a basis for personal jurisdiction over a federal judge and a Judicial Ethics Committee. The Court first considered the reasoning in Liberation News that §1391(e) should not be expanded beyond the Executive Branch, but the plaintiffs argued that the defendants, for purposes of the

18

specific suit, were performing essentially executive functions. The Court disagreed,
however, and held that the defendants were performing essentially judicial functions, so the
provisions of §1391(e) could not be used to establish personal jurisdiction. See also,
Trackwell v. United States, 472 F3d 1242, 1247 (10th Cir. 2007) (recognizing that §§1361
and 1391(e) do not apply to employees of the Judicial Branch when performing judicial
functions).

In the present case, the defendant, the Architect of the Capitol, is not sued on the basis
of any legislative or judicial function that he is alleged to have performed. He is instead sued
on the basis of his execution of a directive from Congress to add engravings of the National
Motto and the Pledge of Allegiance to the Capitol Visitors Center, which the plaintiffs
contend violate the Establishment Clause. This is not an action against Congress, therefore,
nor is the defendant sued on the basis of any legislative function that he performs. He is sued
on the basis of his execution and administration of a directive of Congress, which is within
the subject matter jurisdiction of federal district courts. 28 U.S.C. §1331(a) specifically
provides that the district courts shall have original jurisdiction of all civil actions involving a
federal question. Personal jurisdiction under §1391(e), furthermore, is appropriate as to the
defendant in this case in an executive or administrative capacity.

The plaintiffs, nonetheless, are agreeable to the Court's transferring the pending action
to the District Court for the District of Columbia, in order to obviate the Court's need to
resolve the disputed application of §1391(e) to employees of the Legislative Branch who
perform essentially executive or administrative functions. According to the defendant, the

District Court for the District of Columbia is an appropriate forum for this matter, insofar as both personal jurisdiction and venue are concerned.[1]

The plaintiffs, nonetheless, recognize that the defendant also alleges that he is absolutely immune from suit and that the plaintiffs lack standing, which issues this Court may or may not consider to be more appropriate for resolution by the District Court for the District of Columbia. The plaintiffs, however, do address these other jurisdictional issues for the convenience of the Court. The defendant's Motion to Dismiss for Failure to State a Claim, going to the substantive merits of plaintiffs' case, however, undoubtedly is a matter that would have to be resolved by the transferee court, so that issue is not presently addressed herein. The plaintiffs are fully prepared to address the merits of this action, however, if the Court so requests.

## IV. THE PLAINTIFFS HAVE STANDING TO CHALLENGE THE USE OF APPROPRIATIONS TO CREATE ENGRAVINGS OF RELIGIOUS SPEECH AT THE CAPITOL VISITOR CENTER.

The defendant argues that the plaintiffs lack taxpayer standing to challenge the use of Congressional appropriations to pay for engravings in the Capitol Visitor Center that are allegedly intended to promote religion. The defendant's argument, however, relies upon precedent relating to appropriations given to the Executive Branch of the Federal Government, and made without any express directive from Congress requiring expenditures in violation of the Establishment Clause.

In the present case, the "chasm" between Congressional appropriation and Executive spending decision is not present. Instead, Congress has directed its own officer to undertake

_____

[1] This Court has authority to transfer to the District Court of the District of Columbia even if personal otherwise were lacking in the transferor court. Goldlawr, Inc. v. Heilman, 369 U.S. 463, 466-467 (1962) (holding

Case: 3:09-cv-00439-wmc   Document #: 20   Filed: 03/02/10   Page 21 of 31

a task that necessarily requires the expenditure of funds appropriated under Congress' Taxing and Spending authority. This is not a case where Congress has appropriated money to the Executive Branch, which then exercises its own discretion to utilize funds in an allegedly unconstitutional manner. Here, Congress was both decision-maker and funding source.

In Hein v. Freedom from Religion Foundation, Inc., 551 U.S. 587, 615 (2007), the Supreme Court held that the taxpayer standing exception of Flast v. Cohen, 392 U.S. 83, 102-03 (1968), does not apply "to a purely discretionary Executive Branch expenditure." The Supreme Court, nonetheless, reaffirmed Flast's recognition of taxpayer standing, which is rooted "in the history of the Establishment Clause" and is designed to prevent "the specific evil feared [by its drafters] that the Taxing and Spending power would be used to favor one religion over another or to support religion in general." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 348 (2006). The Flast exception recognizes that the "injury" alleged in Establishment Clause challenges to governmental spending arises not from the effect of the challenged program on the plaintiffs' own tax burdens, but from "the very extraction and spending of tax money in aid of religion."

Decisions subsequent to Hein, including those from the Seventh Circuit, have recognized that the decisive question in Hein was whether Flast extended to suits challenging Executive Branch programs funded by general appropriations. Cf. Laskowski v. Cook, 546 F3d 822, 823 (7th Cir. 2008). The present case, by contrast, does not involve a challenge to an Executive Branch program supported by general appropriations, which is a significant distinction: "Because Flast focused on Congressional action, the plurality [in Hein] declined

---

that a lack of personal jurisdiction can be remedied by transfer under §1406(a)).

the invitation to extend its holding to encompass discretionary Executive Branch expenditures." Laskowski, 546 F3d at 827.

The requirement that Congress' "fingerprints" be clearly visible on allegedly unconstitutional expenditures was also emphasized in Freedom from Religion Foundation, Inc. v. Nicholson, 536 F3d 730, 743 (7th Cir. 2008). The Court refused to recognize taxpayer standing in that case "when the alleged administration [of Congressionally appropriated funds] bears no relationship to Congressional action." In that situation, according to the Court, there is a chasm between the taxpayers' status and the type of Legislative enactment attacked because the lawsuit was not predicated on the complaint that Congress had appropriated money expressly for an unconstitutional purpose directed by Congress.

The Court of Appeals in Nicholson carefully detailed the requirement in Hein that there must be a link between Congressional action and unconstitutional expenditure. The nexus between appropriation and Constitutional violation was missing in Nicholson precisely because the Executive Branch determined and caused the alleged Constitutional violation. As the Court stated in Hein, 127 S. Ct. at 2566, the expenditures at issue "resulted from Executive discretion, not Congressional action."

By contrast, Bowen v. Kendrick, 487 U.S. 589, 619-620 (1988), involved a program of disbursement of funds pursuant to Congress' Taxing and Spending powers that Congress had created, authorized and mandated. According to the Court in Nicholson, however, the plaintiffs in Hein could only "point to unspecified, lump-sum Congressional budget appropriations for the general use of the Executive Branch," which constitute an insufficient

nexus between Congressional action and Constitutional violation.  Nicholson, 536 F3d at
739.

The Court of Appeals' decision in Hinrichs v. Speaker of the House Representatives
of the Indiana General Assembly, 506 F3d 584 (7th Cir. 2007), also turned on the absence of
Legislative responsibility for causing an alleged unconstitutional use of appropriations in
violation of the Establishment Clause.  The Court first examined Hein, which it interpreted to
mean that "the necessary link between Congressional action and Constitutional violation that
supported taxpayer standing in Flast was missing."  Hinrichs, 506 F3d at 597.  In reaching its
own decision in Hinrichs, the Court of Appeals similarly concluded that funds used for a
"Minister of the Day" program in Indiana were not directed to an alleged unconstitutional use
by the Indiana Legislature.  In other words, no allegedly unconstitutional directive came
from the Legislature so as to cause the alleged unconstitutional utilization of funds.

The present case is different than Hein, and subsequent court decisions cited by the
defendant.  Here, the direction to incorporate religious engravings in the Capitol Visitor
Center came directly from Congress.  Although the defendant claims that the Congressional
directive did not have the force and effect of a statutory enactment signed by the President,
the directive was personally compelling on him as an employee of Congress.  The defendant
takes his orders from Congress, and he does not claim that he had authority to ignore
Congress' directive to him regarding religious engravings.  The defendant also does not claim
that the decision to display such religious engravings was the result of his personal
discretion.  He does not even claim that it was his idea -- or that he agrees with the direction
imposed upon him by Congress.  He simply did what Congress required, unlike in Hein.

In the first instance, therefore, the present case differs from Hein and its progeny because the alleged unconstitutional use of taxpayer appropriations is covered with Congress' fingerprints and imprimatur. The alleged Constitutional violation in this case comes at the direction of Congress. Congress did not just give a lump sum appropriation to another branch of the Federal Government, which then allegedly made a discretionary determination to use the appropriation for an unconstitutional purpose. The defendant, in short, has acted at the direction of Congress, unlike in the decisions upon which the defendant relies.

Because the decision-maker and the funding source are the same in this case, the nexus between appropriation and Constitutional violation also is established. The defendant argues disingenuously that Congress' directive to him was essentially an "unfunded mandate," because no funds were appropriated contemporaneously with the directive to create and display religious engravings at the Capitol Visitors Center. An unfunded mandate, however, is a statute or regulation that requires a state or local government to perform certain actions, yet provides no money for fulilling the requirements. When the Federal Government imposes such a law or regulation without necessary funding, the state or local government must assume responsibility to pay for the implementation of the law. That is not the case in the instant action where Congress imposed a requirement on the defendant, but also provided funds to the defendant to carry out his responsibilities. There is no disconnect or "chasm," therefore, between the appropriation and Congress' responsibility for the alleged unconstitutional use of such appropriations.

To disassociate Congress' funding responsibility from the alleged unconstitutional directive in this case would seemingly reward and encourage a sham. Congress has essentially attempted to unbundle its "action directive" from its funding source. When the

24

directing and the funding source are the same, however, no meaningful unbundling can occur. This is particularly true where the Congressional directive to its employee, the defendant in this case, necessarily requires the expenditure of funds, estimated to be more than $100,000 for religious engravings. In this respect, the directive to the defendant is different than the "Minister of the Day" program at issue in Hinrichs, which did not necessarily require the expenditure of any funds, either for a Constitutional or an unconstitutional purpose.

The defendant ironically emphasizes his status as an Officer of Congress, rather than of the Executive Branch, in claiming that he is not subject to personal jurisdiction in this Court. Yet, he disingenuously then relies upon cases involving Executive discretion in arguing that the plaintiffs lack standing because Congress supposedly is not ultimately responsible for the misutilization of appropriations directed by Congress. The defendant attempts to liken his situation to cases like Hein, which turned upon the fact that Congressional appropriations were subsequently allocated to an unconstitutional purpose by and at the discretion of somebody other than Congress.

The Supreme Court's rationale for denying standing in Hein-type situations hinges on the lack of ultimate Congressional responsibility for the unconstitutional use of taxpayer appropriations. Here, however, the identity of the decisionmaker and the funding source are merged into a single entity, and that entity is Congress. The logic and law of taxpayer standing, therefore, support the conclusion that the plaintiffs do have standing to challenge the defendant's creation and display of religious engravings at the Capitol Visitor Center.

## V.  THE DEFENDANT MAY BE HELD JUDICIALLY ACCOUNTABLE FOR UNCONSTITUTIONAL ACTIONS THAT ARE NOT PART OF THE LEGISLATIVE PROCESS.

The defendant further argues that he is immune from any suit claiming that his actions

violate the United States Constitution.  He acknowledges that federal district courts have

subject matter jurisdiction of claims alleging Constitutional violations by federal officials

under §1331(a), but he argues that a statutory waiver of sovereign immunity is necessary in

order to hold federal officials accountable for alleged Constitutional violations.  Unless

Congress agrees to be judicially accountable for Constitutional violations, according to the

defendant, federal officials may act in violation of the Constitution without judicial

accountability.  The defendant relies on multiple authorities addressing alleged statutory

violations by federal officials.

The law is clear that the execution of Legislative directives, if allegedly

unconstitutional, is not immune from judicial review, including under the Speech or Debate

Clause of the United States Constitution, Article I, §6, cl. 1.  As the Supreme Court stated in

Davis v. Passman, 442 U.S. 228, 242 (1979):

> At least in the absence of a "textually demonstrable
> Constitutional commitment of an issue to a coordinate political
> department," Baker v. Carr, 369 US 186, 217 (1962), we
> presume that justiciable Constitutional rights are to be enforced
> through the courts.  And, unless such rights are to become
> merely precatory, the class of those litigants who allege that
> their own Constitutional rights have been violated, and who at
> the same time have no effective means other than the judiciary
> to enforce these rights, must be able to invoke the existing
> jurisdiction of the courts for the protection of their justiciable
> Constitutional rights.  "The very essence of civil liberty," wrote
> Mr. Chief Justice Marshall in Marbury v. Madison, 1 Cranch
> 137, 163 (1803), "certainly consists in the right of every
> individual to claim the protection of the laws, whenever he

26

> receives an injury.  One of the first duties of government is to
> afford that protection."

In Passman, the Supreme Court held that the plaintiff asserted a Constitutionally-

protected right in her complaint alleging that her employer's conduct violated the Fifth

Amendment to the United States Constitution.  The employer in Passman was a United

States Congressman.  The Court concluded that the plaintiff was an appropriate party to

invoke the general federal-question jurisdiction of the district court to seek relief, and that

she had a cause of action under the Fifth Amendment, including a claim for damages.  As a

basis for its decision, to recognize such a cause of action enforceable against federal officials,

the Court noted the distinction between statutory causes of action and those arising under the

Constitution:

> The Constitution does not "partake of the prolixity of legal
> code."  McCullough v. Maryland, 4 Wheat, 316, 407 (1819).  It
> speaks instead with a majestic simplicity.  One of "its important
> objectives," is the designation of rights.  And in "its great
> outlines," the judiciary is clearly discernable as the primary
> means by which these rights may be enforced.  As James
> Madison stated when he presented the Bill of Rights to the
> Congress:
>
> > "If these rights are incorporated into the
> > Constitution, independent tribunals of justice will
> > consider themselves in a peculiar manner the
> > guardians of those rights; they will be an
> > impenetrable bulwark against every assumption
> > of power in the Legislative or Executive; they
> > will be naturally led to resist every encroachment
> > upon rights expressly stipulated for in the
> > Constitution by the Declaration of Rights."

442 U.S. at 241-242.

The present case does not implicate the indepence of the Legislative Branch of the

Federal Government.  The defendant emphasizes that he is technically an employee of

Congress, but that does not necessarily involve any question of legislative immunity. As the

Supreme Court recognized in Dombrowski v. Eastland, 387 U.S. 82, 85 (1967), the doctrine

of legislative immunity has its roots in the Speech or Debate Clause of the Constitution,

which is intended to protect legislators engaged "in the sphere of legitimate legislative

activity." The doctrine, irrespective of a legislator, is more broadly construed than where an

official acting on behalf of the Legislature is sued. Id.

Legislative immunity performs an important function in representative government,

but it does not bar all judicial review of legislative acts. The Supreme Court aptly

recognized this in Powell v. McCormack, 395 U.S. 486, 503 (1969):

> That issue is settled by implication as early as 1803, see
> Marbury v. Madison, 1 Cranch 137, and expressly in Kilbourn
> v. Thompson, the first of this Court's cases interpreting the reach
> of the Speech or Debate Clause. Challenged in Kilbourn was
> the Constitutionality of a House resolution ordering the arrest
> and imprisonment of a recalcitrant witness who had refused to
> respond to a subpoena issued by a House investigating
> committee. While holding that the Speech and Debate Clause
> barred Kilbourn's action for false imprisonment brought against
> several members of the House, the Court nonetheless reached
> the merits of Kilbourn's attack and decided that, since the House
> had no power to punish for contempt, Kilbourn's imprisonment
> pursuant to the resolution was unconstitutional. It therefore
> allowed Kilbourn to bring his false imprisonment action against
> Thompson, the House's Sergeant-at-Arms, who had executed
> the warrant for Kilbourn's arrest.

Although a direct action against a Congressman may be barred, legislative employees

who participate in unconstitutional activity can be held responsible for their acts. Powell,

395 U.S. at 504. "That House employees are acting pursuant to express orders of the House

does not bar judicial review of the Constitutionality of the underlying legislative decision."

Id. In Powell, therefore, the Court concluded that the plaintiff was entitled to maintain his

28

action against House employees and to judicial review of the propriety of the decision to

exclude him because "as was stated in Kilbourn, and language which has not dimmed:"

> "Especially is it competent and proper for this Court to consider
> whether the Legislature's proceedings are in conformity with the
> Constitution and laws, because, living under a written
> Constitution, no branch or department of the government is
> supreme; and it is the province and duty of the judicial
> department to determine cases regularly brought before them,
> whether the powers of any branch of the government, and even
> those of the Legislature in the enactment of laws, have been
> exercised in conformity to the Constitution; and if they have not,
> to treat their acts as null and void." Id at 506.

In Doe v. McMillan, 412 U.S. 306 (1973), the Supreme Court again considered the

issue of official immunity in an action brought against Congressmen, their staff members, the

Public Printer and the Superintendent of Public Documents for allegedly violating statutory,

Constitutional and common-law rights to privacy.  The Supreme Court concluded that, for

the purposes of the doctrine of immunity, the Public Printer and the Superintendent of

Documents were no more free from suit than would be a Legislative aid who made copies of

materials and distributed them to the public at the direction of his superiors.  "The scope of

inquiry becomes equivalent to the inquiry in the context of the Speech or Debate Clause, and

the answer is the same.  The business of Congress is to legislate; Congressmen and aids are

absolutely immune in their legislating.  But when they act outside the 'sphere of legitimate

legislative activity,' they enjoy no special immunity from local laws protecting the good

name or the reputation of the ordinary citizen."  Id at 324.

The purpose of legislative immunity, including as prescribed by the Speech or Debate

Clause of the Constitution, is to protect members of Congress in the sphere of legislative

activity.  To constitute legislative acts, moreover, "they must be an integral part of the

deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." Hutchinson v. Proxmire, 443 U.S. 111, 126 (1979), quoting Gravel v. United States, 408 U.S. 606, 625 (1972).

In Hutchinson, the Supreme Court concluded that nothing in the history or in the explicit language of the Speech or Debate Clause of the Constitution suggests any intention to create an absolute privilege from liability or suit for defamatory statements made outside Congressional Chambers. See also, Bastien v. Campbell, 390 F3d 1301, 1315 (10th Cir. 2004) (holding that even if Legislative action directed a discriminatory action, only the vote itself would be protected by immunity, but the Legislature's agents would be subject to suit); Chastain v. Sundquist, 833 F2d 1311, 1313-14 (D.C. Cir. 1987) (recognizing absolute immunity for members of Congress for purely Legislative activities, but not as to alleged defamatory statements unprotected by the Speech or Debate Clause); Paisley v. Central Intelligence Agency, 712 F2d 686, 696-698 (D.C. Cir. 1983) (holding that Legislative immunity applies to the Legislative process); and Walker v. Jones, 733 F2d 923, 929 (D.C. Cir. 1984) (the purpose of the Speech or Debate Clause is not to forestall judicial review of the Legislative action, but to protect the integrity of the Legislative process; absolute Legislative immunity, moreover, does not extend beyond the scope of the Speech or Debate Clause).

Application of the above principles to the present case establishes that the defendant is not entitled to immunity. The defendant, although an employee of the Legislative Branch of the Federal Government, is alleged by his actions to have violated the United States

Constitution, which action is not immune from judicial review. The fact that the defendant's

actions occurred at the direction of Congress, moreover, does not insulate his actions from

judicial review, because otherwise all Congressional action would be beyond the scope of

Constitutional accountability, which is clearly not the case. The plaintiffs' Complaint,

therefore, should not be dismissed on the alleged basis that the defendant is beyond

Constitutional accountability. He is not so immune.

## VI.  **CONCLUSION**

For all the above reasons, the Court should deny the defendant's Motion to Dismiss.

Dated this 2nd day of March, 2010.

> BOARDMAN, SUHR, CURRY & FIELD LLP
> By
>
> ___*/s/ Richard L. Bolton*___
> Richard L. Bolton
> Wisconsin State Bar No.  1012552
> 1 South Pinckney Street, 4th Floor
> P. O. Box 927
> Madison, WI  53701-0927
> Telephone:  (608) 257-9521
> Facsimile:  (608) 283-1709
> Attorneys for Plaintiffs

### CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification electronically to all attorneys of record.

> */s/Rosalie G. Stapleton*
> Rosalie G. Stapleton

F:\DOCS\wd\26318\24\A0968793.DOC